IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOBAK EMAMIAN, NEW ANGEL CAPITAL, LLC, GEORGE INVESTMENT PARTNERS LP, DEVON GEORGE and HASSAN EMAMIAN, by and through their seller representative and attorney-in-fact, SHAREHOLDER REPRESENTATIVE SERVICES LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>ADAM NEUMANN, ARTHUR MINSON and ROHIT DAVE,<br><br>        Defendants. | Civil Action No. 1:21-cv-00414-LPS |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE COMPLAINT**

OF COUNSEL:

LOWENSTEIN SANDLER LLP
Thomas E. Redburn, Jr. (admitted *pro hac vice*)
Maya Ginsburg (admitted *pro hac vice*)
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 419-5899
Facsimile: (212) 262-7402
tredburn@lowenstein.com
mginsburg@lowenstein.com

POTTER ANDERSON & CORROON LLP
Christopher Samis (#4909)
John A. Sensing (#5232)
1313 N. Market Street
Hercules Plaza, 6th Floor
Wilmington, DE 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
csamis@pottersanderson.com
jsensing@potteranderson.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page(s)

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................2

ARGUMENT ...........................................................................................................................4

    I.     PLAINTIFFS HAVE ADEQUATELY PLED FALSITY ...............................................5

    II.    PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER ..........................................10

    III.   PLAINTIFFS HAVE ADEQUATELY PLED RELIANCE ........................................15

    IV.   PLAINTIFFS HAVE ADEQUATELY PLED A CONTROL PERSON CLAIM
          UNDER SECTION 20(A) OF THE EXCHANGE ACT AS TO NEUMANN AND
          MINSON ...............................................................................................................25

    V.    IF THE COURT DECIDES TO GRANT THE MOTION TO DISMISS, PLAINTIFFS
          SHOULD BE GRANTED LEAVE TO AMEND .......................................................25

CONCLUSION ......................................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*AES Corp. v. Dow Chem. Co.*,
    325 F.3d 174 (3d Cir. 2003)................................................................................15, 17, 18, 20

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972).....................................................................................................24, 25

*Alaska Elec. Pension Fund v. Pharmacia Corp.*,
    554 F.3d 342 (3d Cir. 2009)...............................................................................................11

*In re Apple Computer Sec. Litig.*,
    886 F.2d 1109 (9th Cir. 1989) ............................................................................................24

*Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*,
    441 F. Supp. 3d 23 (D.N.J. 2020) .......................................................................................21

*In re Citigroup Inc. Sec. Litig.*,
    753 F. Supp. 2d 206 (S.D.N.Y. 2010)...................................................................................7

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014)...............................................................................................5, 6

*City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)..................................................................................11

*Collins & Aikman Corp. v. Stockman*,
    2009 WL 1530120 (D. Del. May 20, 2009), *report and recommendation
    adopted in part, rejected in part*, 2009 WL 3153633 (D. Del. Sept. 30, 2009)................15, 16

*Cyber Media Grp., Inc. v. Island Mortg. Network, Inc.*,
    183 F. Supp. 2d 559 (E.D.N.Y. 2002) ..................................................................................9

*In re Daimlerchrysler AG Sec. Litig.*,
    294 F. Supp. 2d 616 (D. Del. 2003)................................................................16, 17, 18, 20

*In re Delmarva Sec. Litig.*,
    794 F. Supp. 1293 (D. Del. 1992).......................................................................................10

*In re Enzymotec Sec. Litig.*,
    2015 WL 8784065 (D.N.J. Dec. 15, 2015)..........................................................................24

*EP Medsystems, Inc. v. EchoCath, Inc.*,
    235 F.3d 865 (3d Cir. 2000)................................................................12, 15, 20, 21

*In re Eros Int'l PLC Sec. Litig.*,
    2021 WL 1560728 (D.N.J. Apr. 20, 2021) ..................................................5, 9

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*,
    376 F. Supp. 2d 385 (S.D.N.Y. 2005), *as amended* (July 6, 2005) ...........................7

*FS Photo, Inc. v. PictureVision, Inc.*,
    61 F. Supp. 2d 473 (E.D. Va. 1999) ......................................................17, 18, 21

*Ganino v. Citizens Utilities Co.*,
    228 F.3d 154 (2d Cir. 2000).....................................................................24

*In re Genzyme Corp. Sec. Litig.*,
    754 F.3d 31 (1st Cir. 2014)......................................................................13

*Institutional Invs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009).......................................................8, 10, 11, 25

*Laborers Loc. #231 Pension Fund v. Cowan*,
    2018 WL 3243975 (D. Del. July 2, 2018) .........................................................5

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011)...............................................................................4

*Maverick Fund, L.D.C. v. Comverse Tech., Inc.*,
    801 F. Supp. 2d 41 (E.D.N.Y. 2011) ........................................................19, 24

*In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*,
    2011 WL 3444199 (D.N.J. Aug. 8, 2011) ...............................................10, 24, 25

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005)...................................................................8, 24

*Merkamerica Inc. v. Glover*,
    2019 WL 8989833 (C.D. Cal. Dec. 3, 2019) ..............................................17, 19

*Omnicare, Inc. v. Laborers Dist. Council. Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)...........................................................................5, 6

*Oran v. Stafford*,
    226 F.3d 275 (3d Cir. 2000)......................................................................9

*Pathfinder Mgmt., Inc. v. Mayne Pharma PTY*,
    2008 WL 3192563 (D.N.J. Aug. 5, 2008) ......................................................18

*Phillips v. Cty. of Allegheny*,
    515 F.3d 224 (3d Cir. 2008)......................................................................4

*Roll v. Singh*,
2008 WL 3413863 (D.N.J. June 26, 2008), *as amended* (Apr. 12, 2010) ...................15, 18, 21

*In re Scholastic Corp. Sec. Litig.*,
252 F.3d 63 (2d Cir. 2001)...........................................................................................8

*SEC v. Mannion*,
789 F. Supp. 2d 1321 (N.D. Ga. 2011) .......................................................................7

*Shapiro v. UJB Fin. Corp.*,
964 F.2d 272 (3d Cir. 1992), *as amended* (May 27, 1992).........................................9

*Sheehan v. Little Switzerland, Inc.*,
136 F. Supp. 2d 301 (D. Del. 2001).............................................................................25

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
499 F. Supp. 3d 49 (D. Del. 2020).......................................................................21, 22

*Straub v. Vaisman & Co.*,
540 F.2d 591 (3d Cir. 1976)........................................................................15, 16, 20, 21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
551 U.S. 308 (2007)..............................................................................4, 10, 11, 12

*In re Wilmington Tr. Sec. Litig.*,
29 F. Supp. 3d 432 (D. Del. 2014)...............................................................................9

## STATUTES

15 U.S.C. § 78...............................................................................................................4, 17

## RULES

Fed. Rule Civ. Proc. 12(b)(6)...................................................................................19, 25

Plaintiffs Bobak Emamian, New Angel Capital, LLC, George Investment Partners LP, Devon George and Hassan Emamian, by and through their Seller Representative and Attorney-in-Fact, Shareholder Representative Services LLC (collectively, "Plaintiffs"), respectfully submit this memorandum of law in opposition to the motion to dismiss the Complaint filed by Defendants Adam Neumann ("Neumann"), Arthur Minson ("Minson"), and Rohit Dave ("Dave") (collectively, "Defendants").[1]

## PRELIMINARY STATEMENT

In an effort to acquire Plaintiffs' company (Prolific) on the cheap, Defendants represented that the common stock of the We Company ("WeWork" or the "Company") was worth $110 per share.  That was a lie – and Defendants repeated that lie, repeatedly.  The true but concealed facts about WeWork's financial condition, business model and reckless and corrupt founder and CEO – of which Defendants were fully aware – collectively undermined that valuation.  When investors ultimately learned the full picture of those facts – after WeWork released its S-1 for its anticipated IPO in August 2019 – WeWork's vaunted $110 per share valuation collapsed to a mere fraction of that amount.  No one who knew the complete picture believed the Company was really worth $110 per share, and no fully-informed, rational, and honest person could have believed that.  Plaintiffs were deceived, sold their company for less than they were promised, and suffered substantial damages as a result.

---

[1] Capitalized terms not defined herein have the same meaning as in the Complaint.  "Compl." refers to the March 22, 2021 Complaint filed at Docket No. 1; "Defs. Mem." refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint filed at Docket No. 16; "Redburn Decl." refers to the Declaration of Thomas E. Redburn, Jr. filed simultaneously herewith; "Kelly Aff." refers to the Affirmation of Jamuna D. Kelly filed at Docket No. 17.

Plaintiffs now seek a remedy for Defendants' violations of the federal securities laws. Because none of their arguments warrants dismissal of Plaintiffs' Complaint, the Court should deny Defendants' motion to dismiss in its entirety.

## STATEMENT OF FACTS

WeWork is a privately held real estate company that rents co-working space. (Compl. ¶ 39.)  Dubbed now a "fraud," "con," and "scam," (*id.* ¶ 76), WeWork was promoted as a tech startup that was revolutionizing the workplace by bettering humanity and promoting community "wellness" and "kindness."  (*Id.* ¶ 44.)  Neumann, WeWork's charismatic but eccentric co-founder, labeled WeWork as a "physical social network" with a mission to "elevate consciousness." (*Id.* ¶ 42.)

As part of Neumann's efforts to turn WeWork into a tech startup, WeWork commonly acquired smaller companies that it believed could contribute to its business, often using its stock as a deal currency.  In late 2018, WeWork and Prolific, a profitable leading mobile application development and design company (*id.* ¶¶ 34, 47), entered into negotiations for WeWork to purchase Prolific.  Neumann and Emamian, Prolific's CEO who led the negotiations on behalf of Prolific, met several times to discuss the acquisition.  During their meetings, Neumann repeatedly touted to Emamian that WeWork was a $47 billion company, with each share valued at $110.  He also discussed the Company going public and stated it would be worth 10 times more after its IPO.  (*Id.* ¶ 49.)  Emamian sought confirmation from Neumann and Dave of the $47 billion value on numerous occasions, including the most recent Series G-1 investment by SoftBank.  (*Id.* ¶ 58.)  Every time, Emamian was referred to public reports in the *Wall Street Journal*, implying there was no material information about the investment in WeWork that was non-public.  (*Id.* ¶¶ 15, 57-58.)  Defendants steadfastly refused to entertain even the idea of negotiating that valuation, presenting it instead as a fact.  (*Id.* ¶ 4.)  In justifiable reliance on

Defendants' statements concerning the value of WeWork, Plaintiffs (and the other Prolific equityholders) sold Prolific to WeWork in a deal that closed June 30, 2019, for total deal consideration of $36 million, consisting of a mix of cash and WeWork common stock valued at $110 per share, plus another $24.5 million in employment restricted stock units ("RSUs").[2]   (*Id.* ¶ 59.)

On August 14, 2019, only six weeks after the deal closed, WeWork filed its S-1.   (*Id.* ¶¶ 7, 11, 65.)   It immediately became clear that the value of WeWork's common stock as of June 30, 2019, was nowhere near $110 per share.   (*Id.* ¶ 6.)   The Company was abysmally unprofitable, its endlessly touted growth trajectory was the product of an unsustainable and failing business model, and Neumann engaged in rampant self-dealing, corruption and reckless behavior.   (*Id.* ¶ 46.)

Among other things, the S-1 revealed the Company was losing $2 for every $1 it recognized as revenue – to the tune of nearly $2 billion in operating losses in the year before the IPO (*id.* ¶ 8); its business model was self-defeating because WeWork entered into long-term lease obligations of over $47 billion, while its customers could cancel short term office rental agreements with as little as one month's notice (*id.* ¶ 7); and Neumann, whose holdings gave him total voting control of the board, engaged in rampant self-dealing and conflicted transactions, including leasing buildings he owned to WeWork, selling the WE family of trademarks to WeWork for nearly $6 million, placing family members on the payroll, obtaining loans from WeWork at below-market interest rates, and using corporate resources to fund his pet projects. (*Id.* ¶¶ 9, 70, 73.)   In addition to the revelations of the S-1, it was also reported that

---

[2] On June 19, 2019, WeWork and Prolific executed the MUPA, which Minson signed on behalf of WeWork.   Section 1.15(e) of the MUPA states: "For purposes of all calculations in this Agreement that include the value of shares of Buyer Stock, such value shall be equal to $110.00 per share of Buyer Stock."   (*Id.* ¶ 59.)

approximately two weeks after the Prolific sale closed, Neumann had cashed out approximately $700 million of his personal stake in WeWork before the Company's IPO.  (*Id.* ¶¶ 9, 64, 72.) Neumann also reportedly engaged in highly questionable behavior involving the consumption of alcoholic beverages at the office and the transportation of marijuana on an international flight. (*Id.* ¶ 73.)

As soon as the public digested the S-1, WeWork's valuation plummeted to as low as $2 billion to $4 billion, and the IPO was aborted.  (*Id.* ¶ 11.)  In October 2019, only a few months after he represented that WeWork shares were valued at $110 each, Neumann agreed to sell the majority of his shares to SoftBank (WeWork's largest investor) for $19.19 a share, or approximately 17.4% of the $110 per share valuation that Defendants used for the Company's acquisition of Prolific.  (*Id.* ¶ 77.)

## ARGUMENT

In considering a motion to dismiss a securities fraud case, the Court must treat the pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 321, 324 (2007).  Rather than parse the allegations individually, the "court[] must consider the complaint in its entirety" to determine whether the claims are properly stated.  *Id.* at 322.  Dismissal is inappropriate even where "it appears unlikely that the plaintiff can prove th[e pleaded] facts or will ultimately prevail on the merits."  *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  The Complaint must also satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act.

To state a claim for securities fraud under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §  78j(b), and SEC Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance

upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Defendants argue the Complaint fails to allege material misrepresentations or omissions, scienter and reasonable reliance. Each of their arguments lacks merit, and the motion to dismiss should be denied.

## I.    PLAINTIFFS HAVE ADEQUATELY PLED FALSITY

Plaintiffs allege Neumann and the other Defendants each made affirmative misrepresentations, and omitted material facts they had a duty to disclose, when they repeatedly told Plaintiffs orally and in writing that WeWork's common stock was worth $110 per share. (Compl. ¶¶ 47-84.) Although Defendants challenge both theories, their arguments run afoul of the governing legal standards.

Defendants' representations concerning WeWork's valuation are best understood as statements of opinion. Under the Supreme Court's seminal *Omnicare* framework (which Defendants do not even mention), a statement of opinion is false or misleading under the federal securities laws if (1) the speaker does not actually hold the stated belief, or (2) the speaker "omits material facts about the issuer's inquiry into or knowledge concerning a statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare, Inc. v. Laborers Dist. Council. Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see generally Laborers Loc. #231 Pension Fund v. Cowan*, No. CV 17-478, 2018 WL 3243975, at *9 (D. Del. July 2, 2018) (applying *Omnicare* to Special Committee's statements about company's business prospects if it remained an independent company). Although the Third Circuit has not explicitly decided whether *Omnicare* applies to Section 10(b) claims, the Supreme Court's framework is consistent with the Third Circuit's pre-*Omnicare* case law under which statements of opinion are "'actionable under the securities laws if they are not honestly believed and lack a reasonable basis.'" *See In re Eros Int'l PLC Sec. Litig.*, No. CV 19-14125,

2021 WL 1560728, at *8 (D.N.J. Apr. 20, 2021) (quoting *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014)) (holding false valuation of intangible assets was actionable under both the *Omnicare* and *Pfizer* frameworks).

Plaintiffs' theory here rests on a straightforward application of these standards. No rational person aware of the true facts about WeWork's financial condition, business model, actual performance, and cash burn – as well as the rampant self-dealing, misuse of corporate resources, reckless personal behavior and appallingly poor judgment of its founder, CEO and controlling shareholder – could possibly have believed that WeWork was worth $110 per share, which was more than ten times the value of its more financially-successful and soberly managed competitor, IWG (Regus). There is no better evidence in support of this theory than what actually happened in the real world: once all of these facts were revealed to the market and investors could finally see the full picture about what was happening at WeWork, ***no rational person did believe*** WeWork was worth $110 per share, which is why the Company's valuation crashed and its IPO failed. (Compl. ¶¶ 62-84.) Plaintiffs have thus stated a claim that Defendants' opinions of WeWork's value were not honestly held under *Omnicare*, and also were not honestly believed and lacked a reasonable basis under *Pfizer*. Defendants further omitted the underlying material facts that contradicted (indeed, fatally undermined) their valuation opinions, thus stating a claim under *Omnicare*'s omissions prong.

None of Defendants' attacks holds water. They first point to the idea that WeWork's stock was difficult to value because it was not publicly traded. (Defs. Mem. at 11-12.) But Plaintiffs' claim here is not that Defendants valued WeWork at $110 per share, when the true value was merely a few dollars less per share (say, $105). Rather, Plaintiffs allege WeWork was actually worth ***only a small fraction of*** what Defendants represented. (*See* Compl. ¶¶ 77-79

(after failed IPO, SoftBank valuing WeWork at approximately $19 per share).)  The fact that WeWork's stock lacked a market price does not excuse Defendants' overvaluing the Company by several orders of magnitude without any objective factual basis.  *See SEC v. Mannion*, 789 F. Supp. 2d 1321, 1333 (N.D. Ga. 2011) ("A reasonable investor would know that the valuation of the Side Pocket was less reliable than typical market-traded securities and that the value of World Health assets would be unstable, ***but they were entitled to expect Defendants to attempt in good faith to determine the best, most accurate value possible for the Side Pocket***.") (emphasis added); *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 235-36 (S.D.N.Y. 2010) (inflated valuation of CDO assets was actionable); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 376 F. Supp. 2d 385, 394-97 (S.D.N.Y. 2005), *as amended* (July 6, 2005) (funds' inflated net asset values were actionable).

Nor can Defendants hide behind SoftBank's Series G-1 investment in WeWork at $110 per share.  (Defs. Mem. at 12.)  There is nothing in the record that indicates what SoftBank was (or was not told) in support of this valuation; why it invested at that valuation (or at all); or even whether the investment was truly at "arm's-length" given the amount of money SoftBank had already invested in WeWork.   Indeed, during negotiations over the Prolific acquisition, Defendants steadfastly refused to provide Plaintiffs any information that would have shed light on those subjects.  (Compl. ¶¶ 15-16.)  What the Complaint's allegations make clear, however, is that the objective facts about WeWork's actual condition in June 2019 show Defendants' $110 per share valuation lacked any basis in reality.  And, Defendants cannot use the SoftBank transaction as justification for duping Plaintiffs if they misled SoftBank in the same way by peddling the same vastly-inflated valuation.   Discerning the implications of SoftBank's investment, if any, is for the factfinder after development of a complete factual record.

Defendants' oft-invoked cry of "fraud by hindsight" also rings hollow on the facts of this case.  (Defs. Mem. at 12-13.)  The disclosures in WeWork's August 2019 S-1 overwhelmingly concerned facts *as they existed in June 2019* – not some unanticipated set of new developments that caused WeWork's operative reality to materially change between June and August.  (*See* Compl. ¶¶ 65-71.)  They thus "confirm what [Defendants] should have known" at that earlier time.  *See In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005) (quoting *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001)) ("[B]oth post-class-period data and pre-class data could be used to 'confirm what a defendant should have known during the class period'" because "'[a]ny information that sheds light on whether class period statements were false or materially misleading is relevant.'"); *see also Institutional Invs. Grp. v. Avaya, Inc*., 564 F.3d 242, 249 n.13 (3d Cir. 2009).   Indeed, the fact that WeWork's underlying financial condition and business fundamentals did not materially change between June 2019 (when Defendants touted its $110 per share valuation) and October 2019 (when SoftBank agreed to a tender offer at just over $19 per share) itself demonstrates the falsity of Defendants' representations as to valuation.  What changed was the market finally learned the whole truth.  Once investors could see the complete picture of the true facts at WeWork, Defendants' valuation was finally exposed as the lie it had always been.[3]  In other words, it is not the case, as Defendants would have it, that WeWork was worth $110 per share in June but only $19 per share in October (which would have made Defendants' valuation representations truthful).  WeWork *was never worth* $110 per share, and Defendants had no reasonable basis for claiming otherwise.

---

[3] Defendants' disclosure of the $110 per share valuation in the S-1 is not a significant indicator of its "reliability" (Defs. Mem. at 12); federal securities fraud jurisprudence is replete with instances in which corporate executives have said things in SEC filings that were flagrantly untrue.  Moreover, Defendants' failure to disclose to Plaintiffs before the S-1 was filed the underlying facts that undercut its valuation enhances the inference they sought to conceal those facts *from Plaintiffs*.

Moreover, Neumann's repeated representations about WeWork's value, "recession proof" business model, and management strengths are not inactionable puffery. (Defs. Mem. at 13-14.) In context – and coupled with Defendants' repeated representations that WeWork was worth $110 per share – these statements were intended to support the stated valuation and, hence, cannot be ruled out at the pleadings stage as immaterial to a reasonable investor or as so vague no reasonable investor could have relied upon them. *See In re Wilmington Tr. Sec. Litig*., 29 F. Supp. 3d 432, 447 (D. Del. 2014) (quoting *Shapiro v. UJB Fin. Corp*., 964 F.2d 272, 282 (3d Cir. 1992), *as amended* (May 27, 1992)) ("By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully."); *In re Eros*, 2021 WL 1560728, at *6-7 (holding that whether defendants' optimistic statements about the company's balance sheet and cash flows amounted to immaterial puffery was for the trier of fact to determine); *Cyber Media Grp., Inc. v. Island Mortg. Network, Inc*., 183 F. Supp. 2d 559, 573 (E.D.N.Y. 2002) (holding that reasonable minds could differ over whether analyst's assertion the company was "double your money stock" constituted mere puffery). The Complaint also specifies the false statements made by Defendants Dave and Minson, including Minson's false representation of valuation in the MUPA. (Compl. ¶¶ 57-59.)

Defendants also had a duty to disclose the material facts omitted from their valuation representations. (*See* Defs. Mem. at 14-16.) Defendants concede such a duty arises when there has been "an inaccurate, incomplete or misleading prior disclosure." (*Id*. at 15 (quoting *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000).) As support for denying the existence of such a duty here, they merely assert again without further analysis that their valuation representations were not misleading. (Defs. Memo. at 15.) That assertion is wrong for the same reasons

discussed above. Further, the fact these omissions concerned "WeWork's management and internal operations" does not render them inactionable. (*Id*. at 15 n.13.) To the contrary, and as one of the decisions cited by Defendants holds explicitly, a "company cannot use deception to cover-up mismanagement or disseminate materially false statements regarding its financial or operating conditions just because those conditions may involve mismanagement." *In re Delmarva Sec. Litig*., 794 F. Supp. 1293, 1302 (D. Del. 1992). That is exactly what Defendants did here when they deceived Plaintiffs about the true state of WeWork's financial condition and management practices, which directly undermined their stated representations to Plaintiffs about WeWork's value. Finally, as discussed more fully below in connection with Defendants' reasonable reliance arguments, the true facts were not disclosed or made available to Plaintiffs before they sold Prolific to WeWork.

## II.    PLAINTIFFS HAVE ADEQUATELY PLED SCIENTER

Defendants also argue that Plaintiffs have failed to allege Defendants acted with scienter. (Defs. Mem. at 16-19.) Defendants' arguments miss the mark.

The totality of the Complaint's allegations is sufficient to give rise to the requisite "strong inference" of scienter – in particular that Defendants acted with severe recklessness. *See Avaya*, 564 F.3d at 267. Recklessness in this context means "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id*. at 267 n.42 (citation and internal quotation marks omitted); *see also In re Merck & Co., Inc. Sec., Derivative & ERISA Litig*., 2011 WL 3444199, at *21 (D.N.J. Aug. 8, 2011) (holding that recklessness constitutes sufficient scienter for opinion statements). In *Tellabs*, the Supreme Court held a "strong inference" of scienter under the PSLRA is one that a reasonable person, after considering the complaint's allegations holistically, would deem "cogent and ***at least as compelling*** as any

-10-

opposing inference one could draw from the facts alleged." 551 U.S. at 324 (emphasis added). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* Quite the contrary, a "tie" on scienter goes to Plaintiffs at the motion to dismiss stage. *City of Pontiac Gen. Emps. Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012). Furthermore, "[i]n assessing the allegations holistically as required by *Tellabs,* the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Avaya*, 564 F.3d at 272-73; *see also Alaska Elec. Pension Fund v. Pharmacia Corp.*, 554 F.3d 342, 351-52 (3d Cir. 2009) (after examining the totality of the complaint, affirming denial of defendants' motion to dismiss and holding plaintiffs adequately alleged scienter despite asserting only two thin paragraphs labeled scienter allegations).

To put the issue here in context, this case is somewhat unusual. Unlike the typical motion to dismiss in a securities fraud action, there is no dispute Defendants knew the concealed facts that undercut their repeated misrepresentations to Plaintiffs that WeWork was worth $110 per share. Indeed, one of their primary defenses to scienter (discussed below) is that they disclosed those very facts to the SEC (but not to Plaintiffs) – meaning they obviously knew about them. (*See* Defs. Mem. at 16-17.) Nor could Neumann credibly argue he did not know about his own conduct, which forms a substantial portion of Plaintiffs' contentions.

The real question is what the appropriate inference is to draw from Defendants' knowledge – did they naively but innocently believe WeWork was really worth $110 per share despite (among other things) losing $2 for every $1 it made and having a founder who constantly exploited the Company's resources for his own personal benefit and engaged in shockingly reckless behavior, as detailed in the Complaint, or did they act recklessly when they insisted on

their stated valuation in contravention of those facts and without disclosing them to Plaintiffs? On this record, the latter inference is at least as compelling as the former, which is enough for a strong inference of scienter under *Tellabs*.  As discussed above, no one with knowledge of the true situation at WeWork could have rationally believed the Company was accurately valued at $110 per share, and after the full truth was finally made known to the market and investors at large, no one did.  *See EP Medsystems, Inc. v. EchoCath, Inc.*, 235 F.3d 865, 881-82 (3d Cir. 2000) (like here, a securities fraud claim by a plaintiff who received personal representations from the defendant; holding scienter pled adequately as to defendant's false pre-investment representations that signing contracts with major customers was imminent where company, in fact, had not entered into a single contract since the plaintiff made its investment).  As in *EP Medsystems*, it "is difficult to see how [Plaintiffs] could have pled fraud or scienter with more specificity without having been given the opportunity to conduct any discovery."  *Id.* at 882.

As they did with falsity, Defendants again try to hide behind the SoftBank Series G-1 investment.  (Defs. Mem. at 16.)  The argument fails for the same reason.  Absent a more robust set of facts documenting how that investment came about, what disclosures and representations were made to SoftBank, and how the valuation was reached – facts that Defendants pointedly refused to disclose to Plaintiffs during negotiations over the Prolific deal (Compl. ¶ 15) – there is no basis for drawing an inference that favors Defendants.  Given the contemporaneous facts known to Defendants about WeWork, an equally plausible inference is they intended to deceive (or recklessly disregarded the risk of deceiving) **both** SoftBank and Plaintiffs.  Indeed, the strength of this latter inference is bolstered by the fact that, after the smoke cleared from the disastrous August S-1, SoftBank **ousted Neumann** from his position as CEO and proceeded to take over WeWork itself.  (*Id.* ¶¶ 76-77.)

Defendants also argue they could not have acted with scienter because WeWork repeatedly disclosed *to the SEC*, in confidential versions of the S-1 that predated the publicly released August version, the facts Plaintiffs allege undercut Defendants' $110 per share valuation. (Defs. Mem. at 17.) But the fact Defendants disclosed these facts to the SEC confirms they both (1) knew of those facts, and (2) considered them material to WeWork's valuation, which is why they disclosed them to the SEC. ***Yet Defendants failed to disclose the same facts to Plaintiffs***. Such transparently and inexplicably selective disclosure raises far more questions than it answers, and gives rise to a plausible inference that Defendants either intended to deceive Plaintiffs in order to obtain control over Prolific at a reduced price or recklessly disregarded the risk of deceiving Plaintiffs when using WeWork's stock as a deal currency. It certainly cannot justify a conclusion that an inference of Defendants' innocence is more compelling than a culpable one.[4] Further, Defendants' reliance on the First Circuit's decision in *In re Genzyme Corp. Sec. Litig.*, 754 F.3d 31, 42-43 (1st Cir. 2014) (cited in Defs. Mem. at 17), is misplaced. Unlike this case, the allegedly concealed facts in *Genzyme* (the company's receipt of a Form 483 from the Food and Drug Administration) were not initially material. The Form 483 only became material in light of subsequent events, at which time the company promptly disclosed it. *Id*. at 42-43. From the perspective of inferring scienter, that is a far cry from Defendants' contemporaneous deliberate concealment from Plaintiffs of facts they concede were material and persistence in pushing a wildly inflated valuation undercut by those same facts.

Defendants' additional arguments also fail.[5] They attack Plaintiffs' allegation concerning

---

[4] Defendants concede that the confidential SEC filings remained confidential and were not available to the public (and therefore Plaintiffs) until August 14, 2019 – the date the S-1 was filed publicly and after the MUPA was signed and the deal closed. (Defs. Memo. at 9 n.6, 17.)

[5] Although Defendants assert they could not have disclosed in June 2019 that WeWork had purchased from Neumann the WE family of trademarks for nearly $6 million (Defs. Mem. at 9

Neumann's willingness to sell his shares to SoftBank in October 2019 for a mere 17.4% of the $110 per share valuation Defendants used for the Company's acquisition of Prolific only four months before. (Compl. ¶¶ 77-78.) But Defendants miss the point by trying to jam that allegation into the typical securities fraud paradigm. (Defs. Mem. at 17-18.) The cases they cite deal with a plaintiff's attempt to use an insider's sale of her stock before the fraud was revealed as grounds for inferring she knew the fraud was occurring. The point of Neumann's post-S-1 sales, however, is exactly the opposite; despite loudly and repeatedly proclaiming WeWork was worth $110 per share, when push came to shove he really did not believe that, which is why he cashed out at whatever price he could get in October 2019. Neumann's desire to sell most of his shares almost immediately after the IPO failed shows he never believed in "the power of We."

Nevertheless, Neumann *also sold* a sizable portion ($700 million worth) of his shares *before* the attempted IPO. (Compl. ¶ 64.) Cashing out at least $700 million only a few months before an IPO that would purportedly result in huge gains for stockholders defies all economic principles unless Neumann believed the disclosures in the S-1 would likely tank the value of WeWork's stock as soon as it was made public. Tellingly, Defendants do not even attempt to challenge the sufficiency of *that* allegation.

Defendants also largely miss the point of the tax valuation given to Plaintiffs by Dave. (Defs. Mem. at 18; Compl. ¶ 80.) While it is certainly conceivable that value for tax purposes could differ from a stock's fair value, two facts negate such an innocent explanation here: (1) the extraordinary disparity between the two valuations ($41.72 versus $110) is inexplicable, and (2) Defendants refused to provide Plaintiffs with the backup for their tax valuation (WeWork's

---

n.5), WeWork, in fact, announced its rebranding in January 2019 – implying this transaction was in the works shortly thereafter and that Defendants were aware of this self-dealing during the negotiations with Plaintiffs.

409A filing).  If the disparity were truly innocent, one would have expected full cooperation from Defendants to explain the tax valuation.  Instead, Plaintiffs were met with more of Defendants' stonewalling.  This allegation thus enhances the overall strong inference of scienter.

## III.   PLAINTIFFS HAVE ADEQUATELY PLED RELIANCE

In a classic "blame the victim" maneuver, Defendants contend Plaintiffs have failed to plausibly allege reasonable reliance on Defendants' false and misleading statements.  (Defs. Mem. at 19-23.)  But Defendants cannot escape responsibility for their fraud so easily, as a virtual avalanche of case law (ignored in their brief) undermines their argument.  The Court should deny Defendants' motion to dismiss.

Establishing reliance for purposes of a Section 10(b) claim "requires a showing of a causal nexus between the misrepresentation and the plaintiff's injury, as well as a demonstration that the plaintiff exercised the diligence that a reasonable person under all of the circumstances would have exercised to protect his own interests." *AES Corp. v. Dow Chem. Co.*, 325 F.3d 174, 178 (3d Cir. 2003).  The standard is one of reasonableness, not clairvoyance.  *See Roll v. Singh*, No. 07-CV-04136FLW, 2008 WL 3413863, at *11 (D.N.J. June 26, 2008), *as amended* (Apr. 12, 2010) (quoting *Straub v. Vaisman & Co.*, 540 F.2d 591, 598 (3d Cir. 1976)) ("'The obligation of due care must be a flexible one, dependent upon the circumstances of each case.  We require only that the plaintiff act reasonably.'").  The Third Circuit has identified five non-exclusive factors "to aid in determining whether a party's reliance was reasonable under all of the circumstances." *AES Corp.*, 325 F.3d at 178.  These factors include: "(1) whether a fiduciary relationship existed between the parties; (2) whether the plaintiff had the opportunity to detect the fraud; (3) the sophistication of the plaintiff; (4) the existence of long standing business or personal relationships; and (5) the plaintiff's access to the relevant information." *Id.* at 178-79; *EP Medsystems*, 235 F.3d at 883; *Straub*, 540 F.2d at 597-98.  The determination of

reasonableness must "be made on a case-by-case basis based on all of the surrounding circumstances." *AES Corp.*, 325 F.3d at 179; *Collins & Aikman Corp. v. Stockman*, No. CIV. 07-265-SLR-LPS, 2009 WL 1530120, at *13 (D. Del. May 20, 2009), *report and recommendation adopted in part, rejected in part,* No. CIV 07-265-SLR/LPS, 2009 WL 3153633 (D. Del. Sept. 30, 2009). Importantly, "the absence of reasonable reliance 'is in the nature of an affirmative defense,' and therefore, the defendant bears the burden of establishing that the plaintiff's reliance was unreasonable." *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 620-21 (D. Del. 2003) (quoting *Straub*, 540 F.2d at 598).

Plaintiffs' claim here is, again, straightforward. They relied on Defendants' false and misleading representations that WeWork's common stock was worth $110 per share in deciding to sell their business to WeWork in exchange for a fixed amount of that same stock. Defendants' representation was both a lie (because no one with knowledge of WeWork's condition could have possibly believed it was really worth $47 billion) and rife with material omissions (because Defendants failed to disclose all the facts showing a $110 per share valuation was pure fantasy). When Plaintiffs asked for backup related to the represented valuation, Defendants either produced information that merely repeated it (such as WeWork's Certificate of Incorporation) or told them to go read publicly available information about SoftBank's Series G-1 investment in the *Wall Street Journal*. (Compl. ¶ 58.) Had Plaintiffs known the truth, they would not have proceeded with the transaction. (*Id.* ¶ 88.) Nothing more is necessary to plead a *prima facie* case of reliance.[6]

---

[6] Contra Defendants (Defs. Mem. at 19 n.15), the Complaint expressly alleges Plaintiffs relied on misrepresentations from all three Defendants, not just Neumann. (Compl. ¶ 86.) Dave and Minson made their false and misleading statements before WeWork's acquisition of Prolific closed, and during a time when Plaintiffs could still have walked from the deal. (*Id.* ¶¶ 57-59.)

Nor have Defendants shown they can establish from the face of the Complaint their affirmative defense that Plaintiffs' reliance was unreasonable.  For starters, the non-reliance clause in the MUPA (and any similar clauses) cannot establish as a matter of law that Defendants could not have reasonably relied on Defendants' false and misleading statements.[7]  *AES Corp.*, 325 F.3d at 180-81.  The Third Circuit held unequivocally in *AES Corp.* that according such preclusive significance to a contractual non-reliance clause violates Section 29(a) of the Exchange Act, which prohibits anticipatory waivers of compliance with Section 10(b)'s duties and obligations.  *Id.*; *see also* 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder … shall be void.").  Although Defendants contend that they are simply pointing to the non-reliance clause as one factor in the overall reliance analysis, their brief harps on it again and again to support an inference that Plaintiffs could not have relied on Defendants' statements because they contractually agreed not to rely on them.  (Defs. Mem. at 20-22.)  That is exactly the type of inference a Court cannot draw against securities fraud plaintiffs at the pleadings stage without running afoul of Section 29(a).

Indeed, the inability to draw such an inference is exactly why federal courts routinely reject the very same argument Defendants make here – even on summary judgment with a fully-developed record.  *See In re Daimlerchrysler*, 294 F. Supp. 2d at 622-23 (refusing to find on summary judgment that sophisticated party's reliance was precluded by integration clause in contract); *FS Photo, Inc. v. PictureVision, Inc.*, 61 F. Supp. 2d 473, 480 (E.D. Va. 1999) (denying motion to dismiss and holding that merger clause in settlement agreement was not

---

[7] In relying on section 4.7 of the MUPA (Defs. Mem. at 6), Defendants conveniently omit the section of the clause that reserves claims arising from reliance on statements of fraud or intentional misrepresentations made within the MUPA (such as the $110 per share valuation).

effective to bar plaintiffs' federal securities claims on reliance grounds); *Merkamerica Inc. v. Glover*, No. CV196111PSGGJSX, 2019 WL 8989833, at *11–12 (C.D. Cal. Dec. 3, 2019) (refusing to find on a motion to dismiss that a merger clause barred plaintiff's reliance on oral statements); *Pathfinder Mgmt., Inc. v. Mayne Pharma PTY,* No. CIV A 06-CV-2204 WJM, 2008 WL 3192563, at *13 (D.N.J. Aug. 5, 2008) ("The Court at this juncture cannot conclude as a matter of law that the existence of a non-reliance clause or the nature of the arm's length transaction precludes Plaintiff's securities fraud claim."); *Roll*, 2008 WL 3413863, at *11 (refusing to dismiss federal securities fraud claim because of the contract's integration clause).

Defendants' attempt to apply the *AES Corp./Straub* factors does not warrant dismissal either.  (*See* Defs. Mem. at 21-22.)  Although Plaintiffs do not allege they had a fiduciary or long-standing business relationship with any of the Defendants, the other three factors favor Plaintiffs.  Most importantly, Defendants stonewalled Plaintiffs' attempt to obtain additional information relating to WeWork's valuation and SoftBank's Series G-1 investment – essentially agreeing to produce only publicly available information pertaining to these subjects which supported their representations.  (Compl. ¶ 58.)  Given Defendants' impediment of Plaintiff's attempted investigation, one cannot infer at the pleadings stage that Plaintiffs had either the chance to detect the fraud or access to the relevant information.  *See AES Corp.*, 325 F.3d at 181-82 (denying summary judgment to defendant on issue of reasonable reliance where defendant "allegedly saw to it that all information received by [plaintiff] would reassure it of the reliability of the earlier supplied data" and "also prevented [plaintiff] from securing the data in [defendant and its affiliate's] files that would have disclosed the fraud."); *FS Photo*, 61 F. Supp. 2d at 483 (denying motion to dismiss on reasonable reliance grounds where defendant "refused plaintiffs' request to conduct a reasonable due diligence inquiry").  Much of the information related to the

fraud – especially regarding Neumann's rampant self-dealing and reckless behavior – was peculiarly within the knowledge of Defendants and WeWork.  Plaintiffs could only review that information if Defendants agreed to provide it.  *In re Daimlerchrysler*, 294 F. Supp. 2d 622 (denying motion for summary judgment on reasonable reliance grounds where the "information was in the province of [defendant] and those close to him, and [plaintiff's representative] could only have known that information which Defendants chose to provide"); *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 57 (E.D.N.Y. 2011) ("When matters are peculiarly within the knowledge of the defendant, a plaintiff may rely on a defendant's representations without conducting an investigation.") (footnote omitted).

Although Defendants now conveniently assert Plaintiffs should have asked for the confidential versions of WeWork's S-1 filed with the SEC before the Prolific transaction closed (Defs. Mem. at 21), Defendants' behavior in connection with the Series G-1 financing, as described in the Complaint and discussed above, strongly suggests they would not have simply turned those documents over to Plaintiffs upon request.  Nothing in the Complaint or any document that can properly be considered on a Rule 12(b)(6) motion even remotely suggests Defendants would have been so forthcoming.  Thus, Defendants' newly minted contention – made only after they have been sued for securities fraud – that they would have gladly shared the confidential versions of the S-1 with Plaintiffs not only rings hollow on its own terms, but also simply cannot be credited on a motion to dismiss.

Nor can Defendants take refuge in Plaintiffs' purported sophistication.  (*Id*. at 22.) Whether and to what extent Plaintiffs are sophisticated parties presents fact issues that (a) cannot be resolved on a Rule 12(b)(6) motion, and (b) are not resolved merely by pointing to boilerplate language in the MUPA identifying Plaintiffs as "Accredited Sellers."  *See Merkamerica*, 2019

WL 8989833, at *12 n.4 (denying motion to dismiss securities fraud claim by wealthy investor in cryptocurrency on reliance grounds; holding that "whether Plaintiff was a sophisticated party is a fact question not amenable to resolution at the pleading stage," and court was not convinced that similar "boilerplate contract language requires the conclusion that Plaintiff was a sophisticated party as a matter of law"). That Plaintiffs built and managed a successful mobile application design business does not necessarily mean they were "sophisticated" when it came to making private investments in an extremely large, complex, privately-held company. That question awaits further fact development.

Furthermore, even if Plaintiffs can legitimately be considered sophisticated investors, that is hardly dispositive of whether they reasonably relied on Defendants' false and misleading statements. As the Third Circuit has held time and again,

> [A] sophisticated investor is not barred [from] reliance upon the honesty of those with whom he deals in the absence of knowledge that the trust is misplaced. Integrity is still the mainstay of commerce and makes it possible for an almost limitless number of transactions to take place without resort to the courts.

*AES Corp*., 325 F.3d at 182 (quoting *Straub*, 540 F.2d at 598); *EP Medsystems*, 235 F.3d at 883; *In re Daimlerchrysler*, 294 F. Supp. 2d at 625. Defendants have no license to cheat an investor merely because he or she is sophisticated, and the policies of full disclosure underlying the federal securities laws are not suddenly transformed into the discredited regime of *caveat emptor* merely because sophisticated investors are the persons who brought suit. *See EP Medsystems*, 235 F.3d at 883 (reversing dismissal on reliance grounds despite plaintiff's sophistication); *In re Daimlerchrysler*, 294 F. Supp. 2d at 625 (denying summary judgment to defendant despite undoubted sophistication of plaintiff stockholder).

At bottom, Defendants attack the quality of Plaintiffs' pre-transaction due diligence – Plaintiffs, according to Defendants, should have demanded more information, asked better

questions, conducted a better investigation, etc.  But Courts across numerous jurisdictions have held that whether an investor conducted adequate or reasonable due diligence is not a question suitable for resolution on a motion to dismiss, as it involves too many fact issues and delicate assessments of the inferences to be drawn from those facts.  Here, as in those cases, deciding these issues is a job for the factfinder after considering a complete record.  *See EP Medsystems*, 235 F.3d at 883 ("Whether MedSystems, after being told by EchoCath's CEO for the second time that contracts with four companies were imminent, should have approached one or more of the four companies and asked for a verification of the present state of negotiations is an issue for the trier of fact, not for a judge ruling on the sufficiency of the pleadings."); *FS Photo*, 61 F. Supp. 2d at 483 ("Whether plaintiffs' failure to investigate was unreasonable in these circumstances is a question of fact that cannot be resolved on a motion to dismiss."); *Roll*, 2008 WL 3413863, at *11 ("Singh argues that Roll failed to exercise diligence because nowhere in the Complaint does Roll allege that he requested financial statements or disclosures from Singh or Wave LLC . . . . Although this may evidence a lack of due diligence on the part of Roll, it is not appropriate to decide such an issue on a motion to dismiss.  It is sufficient that Plaintiff has pled that he relied on Defendants' alleged misrepresentations."); *Caspersen as Tr. for Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 41 (D.N.J. 2020) (applying *Straub*) (denying motion to dismiss on grounds of reasonable reliance and holding that, "[i]n performing due diligence, [plaintiff] was required only to have acted reasonably; reasonableness is a factual issue, to be determined on a case-by-case basis and cannot easily serve as the foundation of a motion to dismiss"); *see also SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 70 n.9 (D. Del. 2020) ("It is not always possible to evaluate the sufficiency or plausibility of reliance allegations at the motion to dismiss stage.") (collecting cases).  This is especially true

given the stridency of Defendants' repeated, uniform representations – made directly to them both orally and in writing – that WeWork was worth $110 per share. *See EP Medsystems*, 235 F.3d at 877-78, 883. The reasonableness of Plaintiffs' reliance on these allegations cannot be resolved on a motion to dismiss.[8]

As for Defendants' half-hearted argument that "the allegedly withheld information was the subject of multiple news articles predating Plaintiffs' execution of the MUPA" (Defs. Mem. at 22), there is much less to this issue than meets the eye. The press reports cited in Defendants' moving brief do not discuss, among other things, the long-term implications of WeWork's business model, the extent of its massive and unsustainable losses and severe cash flow issues or the bulk of Neumann's rampant self-dealing, misuse of corporate resources, insider stock sales or reckless managerial and personal behavior. (*See* Defs. Mem. at 7-9.) Even assuming they provided snippets of problems at WeWork, they certainly did not convey anywhere near the full picture of facts that made a $110 per share valuation laughable. Investors did not get that full picture until the public S-1 was filed, after which WeWork's valuation collapsed and rapidly plummeted to a mere fraction of the $110 per share Defendants had claimed. (Compl. ¶¶ 75-84.)

Moreover, these articles reveal a concerted campaign by Neumann to counteract the effects of any reported negative information about WeWork and to spin the facts as positively for the Company as possible. A good example is the May 15, 2019, *Business Insider* article cited in the Complaint at paragraphs 51 and 67. (Redburn Decl., Ex. E.; Kelley Aff., Ex. 10.) The article reports on an extensive interview with Neumann in which he downplays several negative recent

---

[8] This Court's decision in *SLF Holdings* is distinguishable for the simple reason that the company's public filings in that case disclosed the risks about which the plaintiff complained. *SLF Holdings*, 499 F. Supp. 3d at 65-67. (*See* Defs. Mem. at 20-21.) One cannot reasonably rely on an alleged misleading statement when the supposedly concealed information that rendered it misleading has been disclosed in the company's own SEC filings. *See SLF Holdings*, 499 F. Supp. 3d at 69-70. As discussed in the text, that is not true in the case at bar.

developments.  For example, when commenting on the fact that SoftBank lowered its most recent investment in WeWork from $16 billion to $6 billion, Neumann explained that reduction happened because SoftBank was having "a bad day" in the stock markets, not because of anything wrong with WeWork or its valuation.  (*Id.* at 4.)  As for WeWork's cash burn, Neumann asserted "[w]e do not lose money; we invest money in the future" – because WeWork's spending $1 billion adds members rather than "paying employees or discounting a service." (*Id.* at 5.)  On a related note, Neumann gave a lengthy explanation for why WeWork is "stronger" when a financial downturn occurs and "come[s] out much stronger." (*Id.* at 5-6.)  To assuage investors in response to a revelation that he had leased some of the commercial properties he owns back to WeWork (a conflict of interest), Neumann vowed that "moving forward, whatever I own that has any WeWork tenancy in it is moving to WeWork.  I'll lose money on that transaction, but the reason that's not a problem is because I'm a large shareholder of WeWork.  WeWork is me; I am WeWork.  If it's good for WeWork, it's good for me.  The only vision moving forward is one aligned strategy." (*Id.* at 9.)

Another example is the May 15, 2019, *Axios* article cited in the Complaint at paragraph 51, quoting Neumann as saying that "[WeWork] ha[s] pockets as large as SoftBank." (Redburn Decl., Ex. D; Kelly Aff., Ex. 9.)  Defendants' cherry-picked partial quotes from this article give the impression Neumann was saying WeWork was financially depressed and therefore might not go public.  (Defs. Mem. at 8.)   But Neumann's complete quote leaves quite a different impression:  that WeWork was so financially successful ***it did not need to go public***; "I don't know that we're going to go public.  Every decision here gets made at the time of the decision. We have lots of cash in the bank and access to debt, so we're in no rush." (Redburn Decl., Ex. D at 2.)

Plaintiffs could go on.  The point is that Defendants' truth-on-the-market defense (which is what their argument actually amounts to) fails because the purported corrective information revealed in the articles Defendants cite was not "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements."  *In re Merck*, 2011 WL 3444199, at *35 (quoting *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989)); *Maverick Fund*, 801 F. Supp. 2d at 55 ("A defendant is entitled to rely on the truth-on-the-market defense if it can prove that 'the truth of the matter was already known' and was 'conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'") (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 167 (2d Cir. 2000)); *In re Enzymotec Sec. Litig.*, No. CV145556JLLMAH, 2015 WL 8784065, at *16 (D.N.J. Dec. 15, 2015) (refusing to decide truth-on-the-market defense on a motion to dismiss).  Neumann counteracted the intensity and credibility of any negative disclosures about WeWork with a well-crafted publicity campaign designed to maintain the perceived legitimacy of WeWork's $110 per share valuation.  Plaintiffs therefore cannot be faulted for relying on that represented valuation in selling Prolific to WeWork.  At a minimum, resolution of Defendants' contention that Plaintiffs should have already known the true facts itself raises factual issues that can only be addressed after the development of a full discovery record.

Finally, Plaintiffs are entitled at the pleadings stage to the presumption of reliance recognized in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972), which applies to federal securities fraud claims based primarily on omissions.  *See In re Merck*, 2011 WL 3444199, at *35.  Like the class plaintiffs in *Merck*, Plaintiffs here contend that Defendants' misrepresentations of WeWork's value were both false in and of themselves and also misleading

because they omitted numerous material and contradictory facts. *See id.* (noting that plaintiffs alleged statements about Vioxx's safety profile and side effects were misleading because of the failure to disclose material information about the drug's cardiovascular risks). That is sufficient to invoke the presumption at this juncture. Whether and to what extent the presumption should apply at summary judgment or trial will depend on the evidence developed in discovery in support of Plaintiffs' claims. *See id.* ("Assuming the facts of the Complaint to be true, the Court discerns no reason to conclude on a Rule 12(b)(6) motion that the presumption of reliance under *Affiliated Ute Citizens of Utah* is not available to Plaintiffs.").

## IV.   PLAINTIFFS HAVE ADEQUATELY PLED A CONTROL PERSON CLAIM UNDER SECTION 20(A) OF THE EXCHANGE ACT AS TO NEUMANN AND MINSON

Plaintiffs have stated a valid Section 20(a) control person claim against Defendants Neumann and Minson. (*See* Defs. Mem. at 24.) The Complaint adequately alleges primary liability against all three Defendants, which is imputable to WeWork. *See Avaya*, 564 F.3d at 251-52. Plaintiffs have also alleged that, as WeWork's Chief Financial Officer who signed the MUPA on the Company's behalf, Minson had sufficient control over WeWork to survive a motion to dismiss. *Sheehan v. Little Switzerland, Inc.*, 136 F. Supp. 2d 301, 315 (D. Del. 2001).

## V.    IF THE COURT DECIDES TO GRANT THE MOTION TO DISMISS, PLAINTIFFS SHOULD BE GRANTED LEAVE TO AMEND

If the Court grants Defendants' motion to dismiss, Plaintiffs request leave to amend as amendment would not be futile. Plaintiffs, who have not previously amended their pleading, can supplement the Complaint with additional facts if the Court believes that is necessary.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.

Dated: September 3, 2021

OF COUNSEL:                                  Respectfully submitted,

LOWENSTEIN SANDLER LLP                       POTTER ANDERSON & CORROON LLP
Thomas E. Redburn, Jr. (admitted *pro hac vice*)
Maya Ginsburg (admitted *pro hac vice*)     By: /s/ *John A. Sensing*
1251 Avenue of the Americas                      Christopher Samis (#4909)
New York, NY 10020                               John A. Sensing (#5232)
Telephone: (212) 419-5899                        Jesse L. Noa (#5973)
Facsimile: (212) 262-7402                        1313 N. Market Street
tredburn@lowenstein.com                          Hercules Plaza, 6th Floor
mginsburg@lowenstein.com                         Wilmington, DE 19801
                                                 Telephone: (302) 984-6000
                                                 Facsimile: (302) 658-1192
                                                 csamis@pottersanderson.com
                                                 jsensing@potteranderson.com
                                                 jnoa@potteranderson.com

                                             *Attorneys for Plaintiffs*