## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOBAK EMAMIAN, NEW ANGEL )
CAPITAL, LLC, GEORGE INVESTMENT )
PARTNERS LP, DEVON GEORGE and )
HASSAN EMAMIAN, by and through their )
seller representative and attorney-in-fact, )
SHAREHOLDER REPRESENTATIVE )
SERVICES LLC, )  C.A. No. 1:21-cv-00414-GBW
)
        Plaintiffs, )  **DEMAND FOR JURY TRIAL**
)
  v. )
)
ADAM NEUMANN, ARTHUR MINSON )
and ROHIT DAVE, )
)
        Defendants. )

## FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Plaintiffs Bobak Emamian, New Angel Capital, LLC, George Investment Partners LP, Devon George and Hassan Emamian, by and through their Seller Representative and Attorney-in-Fact, Shareholder Representative Services LLC (collectively, "Plaintiffs"), sold Prolific Interactive LLC ("Prolific") to The We Company ("WeWork" or "Company") in exchange for WeWork common stock. In connection with that transaction, Defendants Adam Neumann, Arthur Minson and Rohit Dave (collectively, "Defendants") defrauded Plaintiffs. Plaintiffs, through their undersigned attorneys, by way of this First Amended Complaint and Jury Demand (the "Complaint"), sue Defendants and allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

Plaintiffs' information and belief is based on, *inter alia*, an investigation by their attorneys, which investigation includes, among other things, a review and analysis of: WeWork's filings with the U.S. Securities and Exchange Commission ("SEC"), WeWork press releases, public

statements by Neumann, media reports, analyst reports, legal actions against WeWork or Neumann and public documents concerning WeWork and Neumann. Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control. Plaintiffs believe that further substantial evidentiary support will exist for the allegations in this Complaint after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      Although it involves some of the most colorful and controversial names in the tech industry universe, this case is about plain and simple securities fraud. WeWork sells memberships (essentially subleases) to individuals or companies who rent out space in its community-inspired office buildings. Up until the collapse of its initial public offering ("IPO") during the fall of 2019, WeWork was one of the darling companies of the investment world. Although its core business model involved little more than capturing the spread between long-term rental costs and short-term subleasing revenues for commercial office space, WeWork convinced the investment community that it was so much more than a mundane real estate company.

2.      Led by Defendant Adam Neumann ("Neumann"), an eccentric, highly-charismatic co-founder with an impressive rags to riches story (as well as, according to press reports, a strong penchant for marijuana and expensive tequila), and powered by tech industry rhetoric and hype, WeWork created an aura around itself as a transformative technology company "committed to maximum global impact" and with a "mission" to "elevate the world's consciousness." WeWork did not simply sublease office space, but provided a "space-as-a-service" membership model (which it supposedly "pioneered") "that offers the benefits of a collaborative culture." This membership "experience" was "powered by technology designed to enable [WeWork's] members to manage their own space, make connections among each other and access products and services,

all with the goal of increasing [the] members' productivity, happiness and success." WeWork thus sold itself as a tech-startup that was going to revolutionize the way younger generations work by creating communal workspaces to inspire community orientation.

3.      In the years prior to 2019, WeWork experienced phenomenal growth. One source of that growth consisted of WeWork's leasing and renovating more and more office space in more and more locations, thereby massively increasing the number of workstations available for renting to members. But another way WeWork grew was by acquiring other companies – particularly companies that filled a need within WeWork's business or provided services it wanted to provide its members. This case arises out of one such acquisition (one of three WeWork made in the summer of 2019 alone): WeWork's purchase of Prolific in June 2019 for a total purchase price of $36 million, consisting of a mix of cash and WeWork common stock, and an additional $24.5 million in employment Restricted Stock Units "RSUs."

4.      Plaintiff Bobak Emamian ("Emamian") was the Chief Executive Officer ("CEO"), co-founder and a large equityholder of Prolific and led the deal from the sellers' side. In a series of meetings and through other communications, Defendants repeatedly represented and insisted to Emamian that the value of WeWork common stock was $110 per share – for a total equity valuation for the company of $47 billion. Indeed, in a January 25, 2019 meeting with Emamian, Neumann personally touted the $110 per share value and brazenly claimed WeWork was worth "ten times" that amount. Neumann and the other Defendants steadfastly refused to entertain even the idea of negotiating that valuation, presenting it instead as an established fact. Emamian served as agent for the other Plaintiffs during these negotiations and relayed the substance of Defendants' representations to them.

5.     Convinced by the stridency, consistency and force of the representations made by Neumann and the other Defendants concerning WeWork's value, and responding to severe economic pressure from Defendants to close the deal quickly and accept WeWork stock as part of the deal consideration, Plaintiffs and the other equityholders of Prolific ultimately agreed that the portion of the deal consideration consisting of WeWork common stock and RSUs would be valued at $110 per share.  At the $110 per share valuation, the total common stock component for the deal was $18 million.  Plaintiffs' portion of the common stock consideration consisted of approximately $8 million worth of shares (approximately 60% of the total consideration Plaintiffs received).  The RSU component of the deal was valued at $24.5 million.  Emamian's share consisted of approximately $10 million worth of RSUs at the $110 per share valuation.  The sale of Prolific to WeWork closed on June 30, 2019.

6.     There was just one problem:  the value of WeWork's common stock as of June 30, 2019, was nowhere near $110 per share.  The representations made by Neumann and the other Defendants were utterly false.  Defendants themselves did not even believe WeWork was worth that much, and at a minimum they acted with reckless disregard for the truth.  They deliberately inflated WeWork's valuation in order to induce Plaintiffs and the other sellers of Prolific not only to accept a greater proportion of the deal consideration in the form of WeWork stock (as opposed to cash), but also (with respect to the stock portion of the consideration) to accept fewer WeWork shares at a higher price per share calculus.  Numerous facts – all of which were concealed from Plaintiffs (but many of which were publicly revealed after the Prolific transaction closed) – establish the abject falsity of Defendants' representations to Emamian concerning the value of WeWork.

7.    *First*, as of June 30, 2019, WeWork's business model was failing spectacularly. Despite all the hype about the power of technology and ambitions to change the world's consciousness, WeWork was really just a real estate company after all – and one that happened to be very poorly run.  As it revealed in the S-1 Registration Statement (the "S-1") it filed on August 14, 2019, in connection with its ill-fated IPO attempt, WeWork entered into leases with its landlords of over 15 years in length, on average, while its own customers could cancel their "memberships" on as little as a month's notice.  It thus faced long-term lease obligations of over $47 billion while having committed revenue of less than one tenth that amount.  This was not a winning formula, even assuming the global and US economies remained strong.

8.    More problematically, because of the massive capital expenditures necessary to constantly acquire and renovate more and more commercial office space for subleasing to members, WeWork's growth model consumed unthinkably large amounts of cash and generated massive operating losses.  Indeed, the S-1 revealed that WeWork was losing $2 for every $1 it recognized as revenue – to the tune of nearly $2 billion in operating losses in the year prior to the IPO.  And, according to the S-1, WeWork did not expect to reach profitability anytime in the near future.  Nevertheless, Defendants claimed that WeWork's value was $47 billion, ***more than ten times*** the contemporary market capitalization of IWG (Regus) – a WeWork competitor that employs a similar business model, had more available square footage than WeWork, operated in more cities, earned more revenue than WeWork and was actually profitable.  Given the reality of WeWork's business in June 2019 (as subsequently revealed), it is inconceivable that Defendants could have believed (let alone reasonably believed) that WeWork had the ability to generate the kind of positive cash flows necessary to support a $47 billion ($110 per share) valuation.  Press reports following publication of the S-1 characterized WeWork as a "fraud," "con," and "scam."

9. *Second*, the corruption of WeWork's management undermined Defendants' absurdly optimistic valuation. As subsequently revealed in the S-1, Neumann engaged in rampant self-dealing and conflicted transactions with the Company, which included leasing buildings he owned to WeWork, selling the WE family of trademarks to WeWork for nearly $6 million, placing family members on the payroll, obtaining loans from WeWork at below market interest rates, and using corporate resources to fund his pet projects. Also, approximately two weeks after the Prolific sale closed, it was reported that Neumann, through a combination of insider stock sales and loans, cashed out a portion of his ownership stake in WeWork to the tune of $700 million ahead of the Company's IPO. Making matters worse from a valuation perspective, through his ownership of high-vote founders' shares, Neumann also had total control over WeWork's Board and management, which prevented the Company from pursuing any strategy or business model other than what Neumann wanted to pursue. This situation was highly-problematic in light of WeWork's pursuit of a financially-ruinous growth strategy and Neumann's highly-questionable behavior. Having the corporation under the near total control of a CEO who (according to press reports) drinks tequila at the office, shows up late and hungover to investor meetings, and transported marijuana on an international flight to Israel is not a recipe for business success. All of these facts detracted from any rational valuation of the Company.

10. *Third*, WeWork admitted to Emamian that its stock was not actually worth $110 per share, but Defendants then convinced Plaintiffs that was not what the Company meant. Plaintiffs and other sellers who received WeWork stock in exchange for their Prolific equity needed to make an election under Section 83(b) of the Internal Revenue Code no later than July 31, 2019. WeWork instructed Plaintiffs to report to the Internal Revenue Service that the value of the WeWork stock they received was only ***$41.72 per share*** – a far cry from its $110 per share

valuation as of June 30, 2019.  When Emamian and his advisors questioned this discrepancy, Defendant Rohit Dave ("Dave") told Emamian the $41.72 valuation was merely "for tax purposes" – meaning it did not detract from WeWork's allegedly "true" value of $110 per share.  When, after the Prolific sale closed, Emamian asked WeWork to produce the Company's most recent 409A filing with the IRS, the supposed support for the value WeWork wanted Plaintiffs to report in their Section 83(b) election, the Company refused – claiming it was a highly confidential document.

11.     *Fourth*, objective market evidence establishes (at the very least) the reckless falsity of Defendants' representations to Plaintiffs that WeWork's stock was worth $110 per share. Defendants (and WeWork) attempted to use this same $47 billion valuation in the Company's aborted IPO.  Yet, almost from the moment WeWork filed its S-1 on August 14, 2019 – and investors could finally see the Company's true financial condition and operating results – the market began to ridicule this valuation.  Over the course of the following six weeks, WeWork and its bankers slashed WeWork's valuation in a desperate attempt to salvage the IPO – first to $30 billion, then to $20 billion and then to between $10 billion and $12 billion.  But investors would not commit to buy the shares at even these reduced values.  Analysts and investors indicated that WeWork's $47 billion valuation was overly inflated and inaccurate.  At the time, at most, they instead valued the Company at between $10 billion and $12 billion, which later fell to approximately $2 billion to $4 billion.  Ultimately – and with Neumann by that time having agreed to relinquish his position as CEO under pressure from the SoftBank Group ("SoftBank") and other shareholders – the Company withdrew its S-1 and indefinitely postponed the IPO on September 30, 2019.

12.     Now in a desperate cash crunch and needing to stave off bankruptcy, on October 22, 2019, WeWork reached an agreement with SoftBank to provide an additional infusion of equity

capital and debt financing.  Part of the deal involved an agreement by SoftBank to acquire up to $3 billion of WeWork stock from other WeWork stockholders through a tender offer – but at a price of no less ***than $19.19 per share***.  That value is approximately 17.4% of the $110 per share valuation that Defendants convinced Plaintiffs to agree to as of June 30, 2019.  Under the facts of this case, it would defy all known principles of corporate finance to believe that WeWork was worth a little more than $19 per share as of October 22, 2019, while also having been worth ***83% more per share less than four months earlier***.  And, apparently, SoftBank believed even that sharply reduced valuation was too rich given that, according to a lawsuit WeWork brought against SoftBank in the Delaware Court of Chancery, SoftBank engineered the failure of a contractual condition precedent so it could cancel the tender offer without having to spend another $3 billion on WeWork stock (the "WeWork Action").  At that time, the *Wall Street Journal* reported that SoftBank has reportedly valued WeWork at approximately $2.9 billion.

13.    Knowing that his WeWork shares were close to worthless, Neumann retained his own counsel and filed a separate lawsuit in the Delaware Court of Chancery – that was later consolidated with the WeWork Action – to force SoftBank to go through with the tender offer so Neumann could tender his shares for cash.

14.    All of this objective market evidence confirms that WeWork was not worth anything close to $110 per share as of June 30, 2019.

15.    *Finally*, SoftBank's earlier investment in WeWork Series G-1 securities in January 2019 at a purported valuation for the Company of $110 per share does not negate Defendants' fraud.  As an initial matter, Emamian requested information about this investment from Defendants during discussions about the Prolific sale, and Defendants referred Emamian to public reports about the SoftBank investment in the *Wall Street Journal*.  The clear implication of Defendants'

position was that whatever material information existed about this investment was publicly available. Neumann, in particular, specifically represented to Emamian that WeWork was worth $47 billion and that this value would increase by 30 percent following the IPO (which was, of course, an abject failure). But more to the point, regardless of what SoftBank may or may not have believed concerning WeWork's true valuation as of January 2019, that does not excuse Defendants' reckless adoption of an absurdly high valuation that contradicted what they knew about the true state of the Company's business and financial condition, which they then represented to Plaintiff as being the gospel truth. Defendants cannot hide behind SoftBank. As we now know, SoftBank did not believe the Company was worth even $20 per share as of October 2019. Indeed, as reported by *The New York Times* in November 2019, SoftBank's CEO, Masayoshi Son, publicly admitted that Neumann had essentially duped him too: "I overestimated Adam's good side," Son told investors at a news conference in Tokyo, noting that for "his negative side, in many cases, I turned a blind eye, especially when it comes to governance."

16.     Furthermore, to the extent Defendants based their valuation of WeWork on the single data point consisting of SoftBank's Series G-1 investment, that decision was reckless. WeWork's Series F and G financing rounds (from 2016 and 2017, respectively) garnered valuations of around $50 per share. A single investor's agreement to double that valuation in a subsequent financing round is not sufficient, by itself, to render that valuation reliable in light of the Company's actual condition.

17.     Plaintiffs bring this action under the federal securities laws to recover the investment losses they suffered as a result of numerous false and misleading statements that Defendants and other WeWork employees made to induce Plaintiffs to sell their interest in Prolific for WeWork common stock. Defendants' misrepresentations to Plaintiffs caused Plaintiffs to

suffer significant investment losses because the WeWork stock they received in exchange for their Prolific equity was worth far less than $110 per share. Plaintiffs actually and justifiably listened to, read, reviewed and relied on Defendants' false and materially misleading statements.

18.    Plaintiffs were unaware of the falsity of Defendants' statements when Plaintiffs sold their equity in Prolific for WeWork common stock. Defendants' misrepresentations caused Plaintiffs to sell Prolific and acquire WeWork common stock at a wildly inflated price. Had it not been for Defendants' repeated material misrepresentations – communicated and conveyed to Plaintiffs by WeWork's CEO and management – Plaintiffs either would not have sold Prolific for WeWork common stock or would not have done so at the $110 per share valuation for WeWork stock. As a result, Plaintiffs are entitled to recover as damages from Defendants the difference between that $110 per share valuation and the true value of the WeWork stock they received in exchange for their Prolific equity, in an amount to be determined at trial.

## JURISDICTION AND VENUE

19.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

20.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

21.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391. WeWork is a Delaware corporation.

22.    In connection with the acts, transactions, and conduct alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange and market.

## PARTIES

23.    Plaintiff Bobak Emamian co-founded Prolific in 2009 and served as its CEO until June 30, 2019, when Prolific was sold to WeWork.

24.    Plaintiff New Angel Capital, LLC ("New Angel Capital") is a limited liability company formed under the laws of the Commonwealth of Virginia.  New Angel Capital was a Prolific equityholder until it was sold to WeWork.

25.    Plaintiff George Investment Partners LP ("George Investment Partners") is a limited partnership formed under the laws of the State of Delaware.  George Investment Partners was a Prolific equityholder until it was sold to WeWork.

26.    Plaintiff Devon George ("George") was a Prolific equityholder at the time Prolific was sold to WeWork.

27.    Plaintiff Hassan Emamian ("H. Emamian") was a Prolific equityholder at the time Prolific was sold to WeWork.

28.    Emamian, New Angel Capital, George Investment Partners, George and H. Emamian are sometimes collectively referred to herein as the "Plaintiffs."  The precise amount of WeWork shares each Plaintiff received is set forth in Exhibit 1, attached hereto.

29.    Plaintiffs proceed in this action by and through Shareholder Representative Services LLC ("SRS").  Pursuant to the Membership Unit Purchase Agreement ("MUPA") dated as of June 19, 2019 (discussed further below), SRS was appointed as Plaintiffs' Seller Representative, attorney-in-fact and agent in connection with the transactions contemplated by that

agreement, including related litigation.  Plaintiffs are the real party in interest and sue here in their own name.

30.    Defendant Adam Neumann co-founded WeWork and served as its CEO, controlling shareholder and Chairman of the Board until his resignation, which was announced on September 24, 2019, after which, Neumann became a Board observer.  At the times relevant hereto, Neumann made statements to Emamian as alleged herein, relating to the value, management, and business operations of WeWork.   Neumann also signed and certified WeWork's Restated Certificate of Incorporation ("COI") pursuant to Sections 242 and 245 of the General Corporation Law of the State of Delaware.

31.    Defendant Arthur Minson ("Minson") was the Company's President and Chief Financial Officer during the times relevant to this complaint.  Minson signed the MUPA on behalf of WeWork.   Minson became the co-CEO of WeWork on September 24, 2019, following Neumann's resignation.   Minson specifically endorsed the fraudulent valuation of WeWork described herein.

32.    Defendant Rohit Dave was the Company's vice-president, head of its corporate venturing unit, and head of mergers and acquisitions during the times relevant to this complaint. At the times relevant hereto, Dave made false and misleading statements pertaining to the value of WeWork.

33.    Neumann, Minson and Dave together are sometimes collectively referred to herein as the "Defendants."

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

####    a.  Prolific

34.    At the times relevant hereto, Prolific was a leading mobile application development and design company that was one of the fastest growing digital transformation companies in the industry.  Prolific engineered transformational technology that was instrumental in driving business results for its clients.  Prolific had profitable and successful long-term partnerships with retail, eCommerce, finance, and other types of companies since its early days.  From its inception until its acquisition, Prolific developed, designed and maintained over 100 mobile applications for some of the largest, most well-known companies spanning numerous industries, including Soulcycle, Gap, Edward Jones, Rent The Runway, Sephora, Saks Fifth Avenue, American Express, Athleta, Old Navy, lululemon, CLEAR, The Wing, and many others.  As of the sale to WeWork, Prolific had three locations across the country, employed more than 117 employees and was in an expansion mode as a result of increased demand for its services.

35.    In addition to its premium brand and unique business model, Prolific's business strategy focused on training its product managers, designers, and engineers to be leaders and revolutionaries in its field, which greatly contributed to its success and value.  In 2018, Prolific reported revenues of approximately $22.8 million, up from approximately $18.4 million in 2017, and $14.7 million in 2016.  Prolific was projected to make approximately $28 million in total revenue for the year 2019.

36.    In addition to its leading training program for its product managers, designers, and engineers, Prolific invented and designed a proprietary Application Management System ("AMS").  The AMS hosted and managed content of mobile applications Prolific created for its

numerous clients.   The innovative software facilitated the seamless curation of featured merchandise by clients and allowed Prolific to manage client content and update applications as needed.  The AMS was a leader in its field and as a standalone product, AMS generated over $1 million in revenue annually.

37.    Around this time, to prepare for and ensure continued growth, Prolific implemented a detailed strategy that would allow it to increase revenue by focusing on inter-business unit operational efficiencies to continue to shorten the sales cycle, increase overall brand value and increase billable time.  As a result, Prolific was projected to dramatically increase revenue over the next 5-7 years.

38.    Due to its unique expertise in the mobile application industry, companies other than WeWork were vying to acquire Prolific, including a prominent marketing holding company.  In 2016, after receiving numerous inquiries about whether it was for sale, Prolific retained bankers and a consulting firm to assist it in vetting potential acquirers.  Neumann and WeWork succeeded in acquiring Prolific precisely because they convinced Emamian and the other Plaintiffs that WeWork's stock was worth $110 per share with yet still greater upside potential.

### b. WeWork and Neumann

39.    WeWork is a privately-held global real estate company that provides co-working space to small companies, freelancers, and others.  Companies rent out offices for their staff, while freelancers use the communal space to work outside of their homes.  According to the Company's website, the vision behind WeWork is "to create environments where people and companies come together and do their best work. . . [WeWork has] grown into a global workplace provider committed to delivering flexible solutions, inspiring, safety-focused spaces, and unmatched community experiences. . . [and is] constantly reimagining how the workplace can help everyone,

from freelancers to Fortune 500s, be more motivated, productive, and happy – because that's how tomorrow works."

40.    Neumann co-founded WeWork and served as its CEO until September 2019.  At the times relevant hereto, Neumann owned Class B and Class C shares in the Company that provided him with voting control over all aspects of the Company.  Specifically, it was disclosed in the S-1 that Neumann owned 20 to 1 super voting shares.

41.    WeWork has grown significantly since its founding.  Its membership base grew by over 100% every year starting in 2014.  In 2017, WeWork achieved $1 billion of run-rate revenue, which grew to $3.3 billion by June 2019. As of June 1, 2019, WeWork's members included 51% of the Fortune 100 and 38% of the Fortune 500. The Company built a recognized brand around its shared office space, with attractive buildings conspicuous in global capitals – from Edinburgh to Johannesburg.  At the time relevant hereto, WeWork had 528 locations in 111 cities in 29 countries, as well as approximately 527,000 total members.

42.    Through the years, Neumann was well known for his unparalleled ability to paint a picture to investors and employees alike of the uniqueness of WeWork.  Neumann dubbed WeWork as a "physical social network" and pitched it as a tech startup company whose mission was to "elevate consciousness."  There are countless reports and articles depicting Neumann's charismatic ability to convince people to invest in the Company. *See* Eliot Brown, *How Adam Neumann's Over-the-Top Style Built WeWork, 'This is Not the Way Everybody Behaves.',* Wall St. J.: Bus. (Sept. 18, 2019).

43.    On its website WeWork prominently displays its values as follows: "Do The Right Thing," "Be Entrepreneurial," "Be Human, Be Kind," "Strive To Be Better, Together," and "Give Gratitude."

44.     Despite its growth, and the message it was presenting to the investing community that it was a tech start-up that was revolutionizing the workplace by bettering humanity and promoting community "wellness" and "kindness," as it was later revealed, WeWork was nothing more than a subleasing company that captured the spread between long-term rental costs and short-term subleasing revenues for commercial office space.    WeWork claimed to be selling a membership "experience" that was "powered by technology designed to enable [WeWork's] members to manage their own space, make connections among each other and access products and services."   But the reality is that WeWork simply offered a trendy desk and chair for monthly rent.

45.     It became clear over time, that Neumann – the face selling the WeWork "holistic" and "inspiring" community lifestyle – was nothing of the sort.   Despite presenting himself in the media as a religious observer who valued quiet time with his family, Neumann was in fact a reckless egomaniac who led with "unusual exuberance and excess."   Eliot Brown, *How Adam Neumann's Over-the-Top Style Built WeWork, 'This is Not the Way Everybody Behaves.',* Wall St. J.: Bus. (Sept. 18, 2019).   In fact, it was later revealed that the real Neumann encouraged tequila shots at the office, banned his employees from eating meat at the office while he continued to do so, and smoked marijuana on international private flights.   *Id.*

46.     As became clear when WeWork filed its S-1, the Company was abysmally unprofitable, its endlessly-touted growth trajectory was the product of an unsustainable and failing business model, and Neumann's guiding lights were not "community" and "gratitude" but instead self-dealing and corruption.

## II.     FALSE AND MISLEADING STATEMENTS REGARDING WEWORK'S $110 PER SHARE VALUATION

47.     WeWork commonly acquired smaller companies that it believed could contribute positively to its business, often using its stock as a deal currency.  In late 2018, WeWork became interested in Prolific as an acquisition target.

48.     According to former WeWork employees familiar with certain discussions, when trying to acquire companies, Neumann would emphasize that in a few years WeWork stock awards would be worth many times what he was offering given the Company's trajectory.  Eliot Brown, *WeWork Employee Options Underwater as Ex-CEO Reaps*, Wall St. J.: Bus. (Oct. 23, 2019); Eliot Brown, *How Adam Neumann's Over-the-Top Style Built WeWork, 'This is Not the Way Everybody Behaves.',* Wall St. J.: Bus. (Sept. 18, 2019) ("In private, Mr. Neumann often talks about the [C]ompany's valuation . . . . He has insisted that [WeWork's] valuation will eventually be many times what it was . . . when it reached $47 billion.").  Neumann followed the same pattern in his efforts to acquire Prolific.

49.     On or about December 20, 2018, Neumann and Emamian met to discuss the acquisition of Prolific by WeWork.  Their second meeting took place on or about January 25, 2019.  At this meeting, Neumann touted to Emamian that WeWork was a $47 billion company, with each share valued at $110.  He also discussed the Company going public and indicated it will be worth 10 times more after its IPO.  Emamian and Neumann also met in February and March of 2019 to discuss deal terms for the acquisition, retaining and integrating the Prolific team into the WeWork structure (something Neumann was fixated on), and Prolific's clientele.  During these meetings, Neumann discussed how valuable WeWork will be after its IPO as well as WeWork's purported profitability, cash flow, and supposedly strong balance sheet at the time.

50.    Neumann also emphasized to Emamian during a discussion in January 2019 (and on several other occasions) that WeWork's business "was recession proof" because, during an economic downturn, business demand for the cheaper office space provided by the Company would only increase.

51.    Neumann also touted WeWork's $47 billion value to investors and the public. When speaking to press, Neumann was notorious for raising WeWork's $47 billion valuation, its IPO, WeWork's business model and unique management style. *See*, *e.g.*, Dan Primack, *WeWork Disclosed Earnings, CEO Discloses Why It Might Go Public,* Axios (May 15, 2019) (quoting Neumann, "[WeWork] ha[s] pockets as large as SoftBank"); Richard Feloni et al. *WeWork's CEO Explains Why He Thinks His $47 Billion Company is Recession-Proof and How He Keeps His Ego in Check as a Young Billionaire,* Bus. Insider (May 16, 2019) (quoting Neumann stating that WeWork is a $47 billion company, valued at $110 per share).

52.    While Neumann was making these representations, on or about March 25, 2019, Defendants and WeWork's Board of Directors received from Ernst & Young LLP ("EY"), WeWork's auditor, the final auditor's report on WeWork's financial statements as of December 31, 2018.  Neumann (as WeWork's CEO and Chairman of the Board), Minson (as CFO) and Dave (as head of M&A who used stock as consideration for many of the Company's acquisitions) received the auditor's report and audited financial statements in the ordinary course of business at the time EY issued them.  The financial statements were prepared in accordance with Generally Accepted Accounting Principles and audited by EY in accordance with auditing standards generally accepted in the United States.

53.    The audited financial statements attached to the report reveal, among other things, that WeWork incurred a net loss of $1,927,419,000 on $1,821,751,000 in revenue in 2018, and a

net loss of $933,494,000 on revenue of $886,004,000 in 2017. In both of WeWork's fiscal years immediately preceding the transaction with Plaintiffs, WeWork lost more money than it took in as gross revenue. Indeed, when 2016 is also considered, the audited financial statements showed that over time the higher WeWork's revenues were, the more money it lost. Growth only further reduced the Company's value and profitability.

54.    In addition, the financial statements received by Defendants include consolidated balance sheets for WeWork showing shareholders' deficits (*i.e.*, negative equity) for WeWork of $2,458,576,000 in 2018 and $1,302,451,000 in 2017.

55.    These financial statements, which contained hard numbers prepared by the Company's management and audited by EY, fatally undermine the notion that WeWork's stock was worth $110 per share. Defendants could not possibly have believed that a company with increased year-over-year losses of nearly $2 billion on only $1.8 billion of revenue, along with a shareholders' deficit of almost $2.5 billion, could sustain such a high valuation. If it continued to operate the way it had been, the Company was on the path to bankruptcy, not a $47 billion bonanza valuation for stockholders. Based on their knowledge of WeWork's actual financial condition and results of operations, Defendants knew (or at least recklessly disregarded) the fact that WeWork's fair valuation was nowhere near $110 per share.

56.    In the discussions with Neumann and WeWork, Emamian served as an agent for the other Prolific equityholders (including Plaintiffs) and relayed to them the substance of Neumann's misrepresentations and misleading statements, especially his repeated representations that WeWork stock was worth $110 per share or more.

57.    WeWork initially proposed acquiring Prolific for all cash, and that was the basis for discussions between the parties until May of 2019. Because under the terms of an all-cash deal

Prolific equityholders would not have any equity stake in WeWork as part of the transaction consideration, there was no need for Plaintiffs to conduct any due diligence on WeWork.

58.     That all changed in May 2019.  In anticipation of the deal closing and the need for a smooth transition to WeWork's ownership, and at Neumann's repeated insistence, Prolific wound down its business with other customers while Emamian and other Prolific employees prepared to start working for WeWork.  By May, Prolific had essentially stopped working for all of its clients other than WeWork.  This left Plaintiffs in a vulnerable position as they made changes to Prolific's business that would have been nearly impossible to reverse, and ended relationships with customers that would be nearly impossible to restore, if the acquisition by WeWork fell through.  Indeed, had the deal failed, Prolific could have been left with a severed relationship with WeWork and no other customers.  The closing was set for June 2019.

59.     Sensing an opportunity to apply leverage to Plaintiffs and improve the transaction's terms for WeWork, Neumann and Minson exploited Plaintiffs' vulnerable position by suddenly demanding in late May 2019 that the transaction consideration be split between cash and stock, with the stock portion of the consideration calculated on the basis of the same $110 per share valuation Defendants had touted since negotiations between the parties began.  Minson endorsed the $110 per share valuation in a conversation with Plaintiff George.

60.     Given how far along Prolific was in preparing for the transition to WeWork's ownership, Plaintiffs had little choice but to agree to the new mix of consideration.  However, Plaintiffs now had virtually no time – a mere 30 days at most – to conduct meaningful due diligence on WeWork to verify the $110 per share valuation.  And, as discussed further below, WeWork stonewalled on providing any meaningful information.

61.     Relying on Neumann's misrepresentations about WeWork's value and its impending IPO, Emamian and the other Plaintiffs (as well as Prolific's other equityholders) agreed to sell Prolific to WeWork for a mix of cash and stock as consideration.

62.     Moreover, in relying on Neumann's misrepresentations of the $110 per share valuation, Emamian elected to receive 79% of his deal consideration in the form of WeWork common stock and elected to receive 90% of his total deal consideration in the form of a combination of WeWork common stock and RSUs.  New Angel Capital, George Investment Partners, George and H. Emamian each elected to receive 50% of their respective deal consideration in the form of WeWork common stock.

63.     In June 2019, Emamian and WeWork negotiated the new terms of the acquisition with the stock consideration component.  During this time, Emamian exchanged several communications with Defendants and other WeWork employees confirming the $110 per share value.

64.     As mentioned above, some Prolific equityholders (including Emamian) received RSUs as part of the transaction, which were calculated using the same $110 per share valuation for WeWork common stock.  On June 2, 2019, in response to a text by Emamian asking "[h]ow much is each RSU unit?" Kristin Greenwood ("Greenwood"), who was employed by WeWork as a Corporate Development Associate at the time and was involved with finalizing the terms of the acquisition, responded that each was valued at $110 per share.

65.     On June 12, 2019, Dave, Greenwood and Emamian exchanged correspondence in which Dave and Greenwood confirmed the $110 per share valuation as it pertained to the acquisition.

66.     On June 15, 2019, to confirm the $110 per share value, Dave sent Emamian WeWork's COI, which was signed by Neumann.  In his cover email, as evidence supporting the $110 per share valuation, Dave pointed to the provision in the COI (which he called the "Charter") listing the price for conversion of the Series G-1 preferred stock into common stock (at a 1:1 ratio) as $110 per share, which in turn was based on the $110 per share original issue price for the Series G-1 preferred shares.  COI at 3, 15-16.  When Emamian asked for information about the Series G-1 investment, Dave and the other Defendants referred him to public reports in the *Wall Street Journal*, implying there was no material information about this investment that was non-public. During this discussion, Dave actually laughed at Emamian for asking for internal WeWork information to verify the $110 per share valuation, telling Emamian to go "look at the articles."

67.     Of course, as of June 2019, Dave and the other Defendants knew what WeWork's audited financial statements said about the Company's actual results of operations and financial condition, as discussed above.  At a minimum, those financial statements rendered Defendants' representations concerning WeWork's purported $110 per share valuation materially misleading, giving rise to a duty on the part of Defendants to disclose those financial results to Plaintiffs before they agreed to sell Prolific to WeWork for a mix of cash and stock at that valuation.  Defendants did not make the required disclosure.

68.     Given the economic leverage WeWork had over Plaintiffs by switching the deal from all cash to a mix of cash and stock *after* Prolific had wound down much of its business other than the work it did for WeWork, and by insisting on a June closing (likely because of the Company's impending IPO attempt) that left no time for a protracted fight between the parties over due diligence, it was reasonable for Plaintiffs to rely on Dave's representation that further

diligence of WeWork's internal financial information was unnecessary.  It was also reasonable for Plaintiffs to rely on Defendants' representations that the $110 per share valuation was legitimate.

69.    Defendants' violation of their duty to disclose WeWork's most current financial statements to Plaintiffs further confirms the reasonableness of Plaintiffs' conduct.  Defendants had no intention of revealing the truth to Plaintiffs about WeWork's financial condition or the fair value of its stock.

70.    In justifiable reliance upon Defendants' statements concerning the value of WeWork, Plaintiffs (and the other Prolific equityholders) sold Prolific to WeWork for total deal consideration of $36 million, consisting of a mix of cash and WeWork common stock, plus another $24.5 million in employment RSUs.  On June 19, 2019, WeWork and Prolific executed the MUPA, which was signed by Minson on behalf of WeWork.  Section 1.15(e) of the MUPA states: "For purposes of all calculations in this Agreement that include the value of shares of Buyer Stock, such value shall be equal to $110.00 per share of Buyer Stock."  On average, Plaintiffs elected to receive approximately 60% of their deal consideration in the form of WeWork common stock.

71.    Emamian elected to stay on as an employee of WeWork following the acquisition. Pursuant to the terms of the MUPA, Prolific employees who were hired by WeWork, were to receive 50% of their deal consideration at closing, 25% at 18 months after closing and 25% at 30 months after closing.  All other Prolific equityholders were to receive a pro-rated amount of shares 18 months after closing.

72.    Unbeknownst to Plaintiffs, the true condition of WeWork's business and financial condition meant that any realistic valuation of the Company was a mere fraction of $110 per share.

### III. THE REASONS WHY DEFENDANTS' REPRESENTATIONS WERE FALSE AND MATERIALLY MISLEADING, AS REVEALED BY WEWORK AFTER THE PROLIFIC ACQUISITION CLOSED

73.     Almost immediately after the execution of the MUPA, Plaintiffs and the public started learning the truth about WeWork. Specifically, it was disclosed WeWork had severe cash flow issues; had experienced tremendous operating losses; and had an unsustainable business model. Furthermore, the Company was riddled with conflicts of interest; Neumann had engaged in rampant acts of self-dealing; and Neumann had misrepresented or lied about the value of WeWork.

74.     The disclosures in WeWork's S-1 and various press reports document the true state of affairs that existed at WeWork at the time Defendants repeatedly represented to Plaintiffs that WeWork stock was worth $110 per share. All of these facts had been concealed from Plaintiffs during their negotiations with WeWork. Yet, the Defendants knew this true state of affairs; indeed, Neumann and the others directly participated in the events and conduct at issue. What the true facts reveal is that WeWork was not worth anywhere near $110 per share at the time it acquired Prolific, and Defendants could not possibly have believed it was. The proof for this point is that, when the market learned of the true facts, no serious market participant believed WeWork could support a $110 per share valuation; in fact, the universal consensus among market participants was that WeWork as a matter of objective fact was actually worth far, far less – which is why the IPO failed miserably.

75.     On July 18, 2019, the *Wall Street Journal* published an article entitled "WeWork Co-Founder Has Cashed Out as Least $700 Million Via Sales, Loans," reporting that Neumann cashed out at least $700 million in WeWork stock only a couple of months before WeWork's

purported IPO in September.  Eliot Brown et al., *WeWork Co-Founder Has Cashed Out as Least $700 Million Via Sales, Loans*, Wall St. J.: Bus. (July 18, 2019).

76.    On August 14, 2019 – less than two months after its acquisition of Prolific closed – WeWork shocked investors and analysts when it disclosed the true nature of WeWork's business and financials in the S-1 it filed with the SEC.  Since the filing of the S-1, WeWork has been publicly criticized – indeed, ridiculed – for its abysmal corporate governance, business model and inability to turn a profit.  All of these facts fatally undermined the notion that WeWork was worth $47 billion or anywhere close to that figure, or that Defendants could have legitimately believed in that valuation.

77.    WeWork revealed that its business model was completely unsustainable because what became clear from the S-1 was that WeWork was nothing more than a real estate company – without much else to offer.  Consistent with the audited financial statements that Defendants received in March 2019 while negotiating the transaction with Plaintiffs, WeWork disclosed losses of approximately $2 billion in 2018 and operational losses of approximately $1.4 billion for the first half of 2019.  Such losses were increasing at a faster rate than revenue, creating a major cash flow problem if WeWork could not find new sources of capital on a regular basis.  Due to the massive capital expenditures necessary to constantly acquire and renovate more and more commercial office space for subleasing to members, WeWork's growth model consumed unthinkably large amounts of cash and generated massive operating losses.  Indeed, the S-1 revealed that WeWork was losing $2 for every $1 it recognized as revenue.  This disclosure revealed its growth-at-all-costs business model was failing and called into serious question whether WeWork could ever actually be profitable without radical changes to the way it operated.

78.     To make matters worse, in the extensive list of risk factors included in the S-1, WeWork admitted the following "We have a history of losses and, especially if we continue to grow at an accelerated rate, we may be unable to achieve profitability at a company level (as determined in accordance with GAAP) for the foreseeable future."  As another risk factor, WeWork questioned its own ability to survive a financial recession:  "An economic downturn or subsequent declines in market rents may result in increased member terminations and could adversely affect our results of operations."  These statements directly contradicted an interview Neumann gave in May of 2019 in which he explained why WeWork is "recession proof" and statements made to Emamian by Defendants during negotiations.  *See* Richard Feloni et al. *WeWork's CEO Explains Why He Thinks His $47 Billion Company is Recession-Proof and How He Keeps His Ego in Check as a Young Billionaire,* Bus. Insider (May 16, 2019).

79.     WeWork also revealed that it had entered into long term leases of approximately 10-15 years for its co-sharing spaces and was therefore on the hook for approximately $47 billion in future lease payments to building owners.  This put the Company at extreme risk given that its revenues derived from short-term "memberships" that rarely exceeded two years in length and usually could be terminated on as little as one month's notice.

80.     Despite being privy to the truth about WeWork's financial decline and unsustainable business model, Defendants claimed that WeWork's value was $47 billion, ***more than ten times*** the contemporary market capitalization of IWG (Regus) – a WeWork competitor that employs a similar business model, had more available square footage than WeWork, operated in more cities, earned more revenue than WeWork and was actually profitable.  Given the reality of WeWork's business in June 2019 (as subsequently revealed), it is inconceivable that Defendants could have believed (let alone reasonably believed) that WeWork had the ability to generate the

kind of positive cash flows necessary to support a $47 billion ($110 per share) valuation. Nonetheless, they concealed all of these facts from Plaintiffs.

81.    In the same S-1, WeWork disclosed troubling self-dealing and conflicts of interest as a result of Neumann's management and control over WeWork.  In particular, WeWork revealed the following:

(1) WeWork loaned Neumann millions of dollars against his WeWork stock at interest rates well below 1%;

(2) as part of the July 2019 "rebranding" of the Company from WeWork to "The We Company," Neumann procured a trademark for the phrase "We" and "The We Company" and forced the Company to pay him $5.9 million to license its use of the word "We";

(3) Neumann had a personal line of credit of up to $500 million, of which approximately $380 million principal amount was outstanding as of July 31, 2019, that was secured by Neumann's WeWork stock from UBS, JPMorgan, and Credit Suisse, all of whom were coincidentally underwriters in WeWork's IPO;

(4) in early 2019, WeWork issued a $362 million loan to Neumann in connection with an early exercise of stock options;

(5) in the event of Neumann's death, his wife Rebekah Paltrow Neumann ("Ms. Neumann") and two close friends who served as high ranking WeWork directors would select Neumann's successor, not the board;

(6) several buildings leased by the Company housing its co-sharing space were owned by Neumann who was paid more than $12 million between 2016 and 2018 alone in rent for the buildings he owned and was leasing to the Company; and

(7) Neumann employed direct family members to work at WeWork, including Ms. Neumann who served as the CEO of the Company's education business, WeGrow, Neumann's brother-in-law who ran

We's fitness offering, as well as several other members of
Neumann's immediate family, one of which served in a senior role.[1]

82.    These disclosures revealed a disturbing pattern of self-dealing on Neumann's part,
in which he failed to recognize any meaningful distinction between the Company's assets and his
own.  The Company's exposure to such serious conflicts of interest and governance deficiencies
negatively impacted its ability to execute on its (already unsustainable) business plan and drove
its valuation even lower than already justified by its financial metrics and operational performance.

83.    The market also learned of other material facts the S-1 did not disclose.  For
example, the S-1 did not disclose Neumann's sale of over $700 million in WeWork stock prior to
the filing of the S-1, as was reported by the *Wall Street Journal*.  Nor did the S-1 disclose that the
Company purchased a $60 million top-of-the-line Gulfstream jet for Neumann's use during his
time as CEO.  Jean Eaglesham & Eliot Brown, *WeWork Investors Turned Off by 'Sloppy' IPO
Filings*, Wall St. J.: Bus. (Oct. 7, 2019).  On September 27, 2019, *Business Insider* reported that
the Gulfstream was put up for auction after Neumann's exit, citing some investors as saying that
"the private plane was a corporate-governance red flag." Megan Morris, *WeWork is Selling the
Company's $60 Million Luxurious Private Jet that Adam Neumann and His Family Personalized
and Used to Fly All Over the World*, Bus. Insider (Sept. 26, 2019).

84.    In addition to disclosures pertaining to WeWork's financial troubles, disclosures
pertaining to Neumann's erratic behavior and mismanagement of the Company were also being
revealed.  For example, it was reported that Neumann was surfing in the Maldives when he needed
to review documents in preparation for the IPO.  Not wanting to cut his surfing trip short, Neumann

---

[1] The term "related parties" or "related party" appears more than 100 times in WeWork's S-1.  As
a point of comparison, the term "related parties" or "related party" appears thirty (30) times in Lyft
Inc.'s prospectus and seven (7) times in Uber Technology Inc.'s prospectus.

flew out a WeWork employee to the Maldives for an in-person briefing paid for by Company funds.  Maureen Farrell et al., *The Fall of WeWork: How a Startup Darling Came Unglued*, Wall St. J.: Bus. (Oct. 24, 2019).  As another example, it was also reported that Company money was used to fund Neumann's personal interest projects, including a $32 million investment in surfer Laird Hamilton's startup, Laird Superfood, and $14 million into Wavegarden, a company that makes surfing-wave pools.  And, as the icing on the cake, investors learned of Neumann's consumption of tequila at the office and marijuana while traveling overseas.  Eliot Brown, *How Adam Neumann's Over-the-Top Style Built WeWork, 'This is Not the Way Everybody Behaves.',* Wall St. J.: Bus. (Sept. 18, 2019).

85.     Given Neumann's total control over WeWork, his erratic and irresponsible personal behavior – especially when coupled with evidence of his ridiculously outsize ambitions to change the world – also depressed the Company's valuation because, like the examples of self-dealing by Neumann described above, it undermined any notion that WeWork was being managed prudently. All other things being equal, a company with reckless and irresponsible management is less valuable than one whose managers are prudent and careful, because it is far more likely the latter will successfully marshal the company's resources to optimize its performance.  Yet, here, the inference is even stronger because Neumann's personal irresponsibility and recklessness as CEO manifested in the Company's business through its endemic lack of profitability, massive losses and cash burn and pursuit of growth using an inherently unsustainable business model, as described above.  Defendants concealed all of these facts from Plaintiffs.

86.     During the meetings and discussions leading up to WeWork's acquisition of Prolific, Neumann and the other Defendants failed to disclose WeWork's cash flow problems, massive operating losses, the unsustainable nature of the Company's business model, Neumann's

self-dealing and erratic behavior, or that Neumann sold or was selling large blocks of his WeWork shares privately. Neumann and the other Defendants knew or recklessly disregarded that these concealed facts fatally undercut WeWork's purported $47 billion valuation and rendered their representations concerning this valuation highly misleading.

87.     Following the release of the S-1, analysts reacted highly negatively to the disclosures described above, prompting WeWork to repeatedly and substantially decrease its purported $47 billion valuation. Media reports directly connected these valuation declines to WeWork's disclosures in the S-1, calling the Company "the epitome of fraud," a "con," and a "scam." Over the course of the six weeks following WeWork's filing of its S-1, WeWork and its bankers tried to revive the IPO by slashing WeWork's valuation – first to $30 billion, then to $20 billion and then to between $10 and $12 billion. But investors would not commit to buy the shares at even these reduced values. Ultimately, WeWork shelved its IPO in September after investors grew wary of its mounting losses, a business model with high leasing liabilities and horrific corporate governance. SoftBank and other WeWork shareholders then forced Neumann to resign as CEO.

88.     In a short span of six weeks, WeWork had gone from filing one of the hottest IPOs of the year to operating on the verge of bankruptcy. SoftBank rode to the Company's rescue, but at a much more realistic valuation of its common stock that was radically below the $110 per share touted to Plaintiffs and then to prospective IPO investors. On October 22, 2019, WeWork reached an agreement with SoftBank to provide the Company with several billion dollars of additional equity and debt financing. Part of the deal involved an agreement by SoftBank to acquire up to $3 billion of WeWork stock from other WeWork stockholders through a tender offer – but at a price of no less **than $19.19 per share, or approximately 17.4% of the $110 per share valuation that**

***Defendants used for the Company's acquisition of Prolific***.  Yet this much-reduced valuation was more consistent with the financial results contained in WeWork's audited financial statements that Defendants received from EY in March 2019, which they recklessly disregarded, and a far fairer reflection of what WeWork was actually worth in June 2019.

89.    As part of the agreement between WeWork and SoftBank, SoftBank agreed to acquire a majority of Neumann's WeWork shares.  Neumann's eagerness to sell a large portion of his shares – at a fraction of the value he touted to Plaintiffs only a few months earlier – is proof Neumann could not, and did not, ever reasonably believe WeWork was worth $47 billion.

90.    Under any reckoning of the objective facts, WeWork was not worth anything close to $110 per share as of June 30, 2019.  The $110 per share valuation was a sham, and Defendants' representations to Plaintiff about it were knowingly (or at least recklessly) false.  It simply cannot be the case that WeWork was worth a little more than $19 per share as of October 22, 2019, while also having been worth $110 per share a mere four months earlier.

91.    Indeed, in retrospect it is now clear that WeWork admitted to Plaintiffs right around the time the Prolific transaction closed that the Company's stock was not actually worth $110 per share, even though Defendants successfully convinced Plaintiffs to ignore that evidence at the time.  Plaintiffs and other sellers who received WeWork stock in exchange for their Prolific equity needed to make a tax-related election under Section 83(b) of the Internal Revenue Code no later than July 31, 2019.  After it was too late for Plaintiffs to back out of the deal, WeWork instructed Plaintiffs to report to the Internal Revenue Service that the value of the WeWork stock they received was only ***$41.72 per share*** – a far cry from its $110 per share valuation as of June 30, 2019.  When Emamian and his advisors questioned this discrepancy on behalf of all Prolific equityholders, Dave falsely told Emamian the $41.72 valuation was merely "for tax purposes" –

meaning it did not detract from WeWork's allegedly "true" value of $110 per share. When, after the Prolific sale closed, Emamian asked WeWork to produce the Company's most recent 409A filing with the IRS, the supposed support for the value WeWork wanted Plaintiffs to report in their Section 83(b) election, the Company refused – claiming it was a highly confidential document. The significantly reduced valuation clearly shows that the Defendants did not believe and could not believe that WeWork common stock was worth $110 at the time of the acquisition.

92.     On November 15, 2019, *Bloomberg Law* and the *Wall Street Journal* reported that WeWork was subject to an SEC probe connected to WeWork's business and disclosures to investors amid the Company's numerous conflicts of interest. The SEC took issue with WeWork's irregular financial reporting rules, including the cash flow measure it dubbed "contribution margin."

93.     On November 19, 2019, news reports further stated that the New York Attorney General initiated an investigation into WeWork pertaining to Neumann's self-dealing "to gain financial benefits."

94.     On January 28, 2021, the *Wall Street Journal* reported that WeWork was in talks to combine with a special-purpose acquisition company in an attempt to go public by bypassing the traditional IPO. The deal ***could*** value WeWork at $10 billion, but it is unclear whether this valuation includes debt. In the spring of 2020, Softbank valued WeWork at $2.9 billion. These valuations are a far cry from WeWork's $47 billion valuation that Defendants touted to Plaintiffs in 2019.

95.     It is unreasonable to conclude that Neumann and the other Defendants, who knew about the extensive conflicts of interest, self-dealing, cash-flow problems, erratic personal behavior by the CEO and unsustainable business model, actually believed WeWork was valued at

$110 per share.  Nor is it reasonable to conclude that Defendants believed WeWork's value would rise after these disclosures were revealed to the world in the S-1.  Instead, Defendants fraudulently induced Plaintiffs into selling their profitable company for practically worthless WeWork shares.

## RELIANCE

96.     Plaintiffs are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact that there was a duty to disclose.

97.     In addition, as explained above, Plaintiffs actually and justifiably listened to, read, reviewed, and relied upon Defendants' misrepresentations (as described in this Complaint) prior to selling their equity in Prolific to WeWork in exchange for (among other forms of consideration) WeWork common stock.

98.     Plaintiffs had no way of knowing that Defendants' representations were false.  Nor did Plaintiffs have any way to know about the conflicts of interest, unsustainable business model or turbulent management.

99.     Had Plaintiffs known the truth, they would not have accepted WeWork common stock as consideration (either at all or at the $110 per share valuation) for the sale of Prolific.

## LOSS CAUSATION

100.     Because WeWork was and is a private company, there is no public market for its common stock and no quotable trading price.  Loss causation in this case thus is not based on the trading price of the securities at issue.

101.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs.  In reliance of Defendants' false and misleading representations, Plaintiffs sold their equity in Prolific in exchange for deal consideration that

included WeWork common stock purportedly worth $110 per share. Because that stock was worth far less than $110 per share, as represented by Defendants as of the June 30, 2019 closing date for the sale of Prolific to WeWork, Plaintiffs suffered damages in the form of the difference between the false $110 valuation and the stock's actual fair value as of June 30, 2019. As a result of the information disclosed publicly after that date, the falsity of Defendants' representations concerning the value of WeWork was revealed.

102.    Indeed, in response to WeWork's S-1 filing, WeWork's valuation plummeted. What was once valued at a $47 billion company was now being valued below $10 billion, a decline of nearly 80%. The timing and magnitude of WeWork's valuation decline, as well as the lack of any other plausible cause of the decline, negates any inference that the loss suffered by Plaintiffs was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

103.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not "forward-looking statements" nor were they identified as "forward-looking statements" when made. Nor was it stated with respect to any of the statements forming the basis of this Complaint that actual results "could differ materially from those projected." To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those

forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of WeWork who knew that those statements were false when made.

**FIRST CAUSE OF ACTION**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Against All Defendants**

104.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

105.    This Cause of Action is asserted against all Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

106.    Defendants both directly and indirectly used the means and instrumentalities of interstate commerce in the United States to make the materially false and misleading statements and omissions of material fact alleged herein to: (i) deceive Plaintiffs, as alleged herein; (ii) artificially and deceptively inflate the value of WeWork common stock; and (iii) cause Plaintiffs to sell their equity in Prolific in exchange for WeWork common stock that was worth far less than Defendants represented.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants took the actions set forth above.

107.    Defendants both directly and indirectly: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon Plaintiffs in an effort to artificially and deceptively inflate the value of WeWork common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

108.    By virtue of their high-level positions at the Company, Defendants were authorized to make public statements, and made public statements on WeWork's behalf.  Defendants were privy to and participated in the creation, development, and issuance of the materially false and misleading statements alleged herein, and/or were aware of the Company's and their own dissemination of information to the public that they recklessly disregarded was materially false and misleading.

109.    In addition, Defendants had a duty to disclose truthful information necessary to render their affirmative statements not materially misleading, including information with respect to WeWork's unsustainable business model, conflicts of interest, financial condition, and self-dealing, so that the Company's valuation would be based on truthful, complete and accurate information.

110.    Defendants acted with knowledge or reckless disregard for the truth of the misrepresented and omitted facts alleged herein, in that they failed to ascertain and disclose the facts, even though such facts were known or readily available to them.  Defendants' material misrepresentations and omissions were done knowingly and/or recklessly, and had the effect of concealing the truth with respect to WeWork's operations, business, performance and prospects from the public, including misstating the sustainability of the Company's business model, revenue, and management.  By concealing these material facts from Plaintiffs and the public, Defendants supported the artificially inflated value of WeWork common stock.

111.    The dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, artificially inflated the value of WeWork common stock. In ignorance of the fact that WeWork's value was artificially inflated, and relying directly upon the materially false and misleading statements made by Defendants, and upon the absence of

material adverse information that was recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Plaintiffs sold Prolific for artificially inflated WeWork common stock.    When WeWork's S-1 was filed revealing conflicts of interest, self-dealing, mismanagement, an unsustainable business model and dire financial conditions, the value of WeWork substantially declined.

112.    At the time of the material misrepresentations alleged herein, Plaintiffs were ignorant of their falsity, and believed them to be true.  Had Plaintiffs known the truth with respect to the business, management, financial condition, performance and prospects of WeWork, which was concealed by Defendants, Plaintiffs would not have sold their equity in Prolific for WeWork common stock, or if they had purchased such common stock, Plaintiffs would not have done so at the artificially inflated prices.

113.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

114.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

**SECOND CAUSE OF ACTION**
**Violations of Section 20(a) of the Exchange Act**
**Against Defendants Neumann and Minson**

115.    Plaintiffs repeat and reallege each and every allegation contained in each of the foregoing paragraphs as if set forth herein.

116.    This Cause of Action is asserted against Defendants Neumann and Minson and is based upon Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

117.    At the time of the wrongs alleged herein, Neumann and Minson were each a controlling person of WeWork within the meaning of Section 20(a) of the Exchange Act.

118.    By virtue of their high level positions, and their ownership and contractual rights, substantial participation in, and/or awareness of, the Company's operations and/or knowledge of the materially false and misleading statements made and disseminated to Plaintiffs and the public, Neumann and Minson had the power to influence and control, and did in fact influence and control, directly or indirectly, the decision-making and operations of the Company.

119.    Neumann and Minson were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged herein to be materially false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  In particular, Neumann and Minson had direct and supervisory involvement in the day-to-day operations of the Company, and therefore are presumed to have had the power to control or influence the particular false and misleading statements and omissions giving rise to the securities violations alleged herein.

120.    By reason of the conduct alleged in the First Cause of Action, Defendants are liable for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and Neumann and Minson are liable pursuant to Section 20(a) based on their control of WeWork.

121.    Neumann and Minson are liable for the aforesaid wrongful conduct, and are liable to Plaintiffs for the substantial damages suffered in connection with their purchase of WeWork common stock.

122.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.  Consequently, this action is timely.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request relief and judgment, as follows:

(a)    Awarding compensatory damages against Defendants for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon;

(b)    Awarding Plaintiffs punitive damages;

(c)    Awarding Plaintiffs attorneys' fees and costs; and

(d)    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

Dated: February 7, 2023

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Thomas E. Redburn, Jr.                By: */s/ John A. Sensing*
Maya Ginsburg                             Christopher Samis (#4909)
LOWENSTEIN SANDLER LLP                    John A. Sensing (#5232)
1251 Avenue of the Americas               1313 North Market Street
New York, NY 10020                        Hercules Plaza, 6th Floor
Telephone: (212) 419-5899                 Wilmington, DE  19801
Facsimile:  (212) 262-7402                Telephone: (302) 984-6000
tredburn@lowenstein.com                   Facsimile:  (302) 658-1192
mginsburg@lowenstein.com                  csamis@potteranderson.com
                                          jsensing@potteranderson.com

*Attorneys for Plaintiffs*